**UNITED STATES of America, Appellee,**

v.

**Jay Lewis DWORKEN, a/k/a Jason Lewis, Jay Lewis, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**William S. GAY, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Steve ROGOVE, Defendant, Appellant.**

**Nos. 87–1354, 87–1769 and 87–1770.**

United States Court of Appeals, First Circuit.

Heard June 7, 1988.

Decided Aug. 29, 1988.

Rehearing Denied in No. 87–1354 Oct. 17, 1988.

Robert I. Kalina with whom Kalina & Guido, New York City, was on brief for appellant Jay Lewis Dworken.

Appellant William S. Gay submitted on the brief of appellant Steve Rogove, and on Parts III and IV of appellant Jay Lewis Dworken's brief.

Alan M. Dershowitz, Cambridge, Mass., with whom Nathan Z. Dershowitz, Dershowitz & Eiger, P.C., New York City, and Ellen Schneider, Washington, D.C., were on brief for appellant Steve Rogove.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., William H. Browder, Jr., and Paula D. Silsby, Asst. U.S. Attys., Portland, Me., were on brief for appellee.

Before COFFIN and BREYER, Circuit Judges, and ACOSTA,* District Judge.

COFFIN, Circuit Judge.

Jay Dworken, Steven Rogove and William Gay appeal their convictions for attempting to possess marijuana with the intent to distribute it. We affirm the judgments.

*Of the District of Puerto Rico, sitting by designa-

## I. FACTS

We first outline the criminal scheme revealed by the evidence, adding more detail in our subsequent discussion of specific issues.

This case arises out of a classic undercover reverse drug sting conducted by the Drug Enforcement Administration (DEA). Appellant Jay Dworken was contacted by undercover DEA Agent Michael Cunniff in regard to assistance Dworken was seeking for the importation of some narcotics. Dworken and Cunniff discussed possible offload sites for Dworken's load during several conversations in late 1985 and early 1986. Cunniff, with the assistance of undercover Maine State Police Trooper Steven Spaulding, proposed an offload site in Maine for Dworken.

When Dworken's own venture did not progress as planned, Cunniff directed discussions to a fictitious 20–ton load of marijuana that he offered to sell to Dworken. Dworken agreed to help broker the drugs between Cunniff (and Cunniff's fictitious "boss") and various "buyers." During February 1986, Dworken and Cunniff had several preliminary negotiations regarding this proposed scheme. Cunniff eventually offered 53,000 pounds of marijuana. Dworken agreed to provide the buyers, and offered a warehouse in Connecticut that could accommodate the narcotics. This plan became the focus of the charges in the instant case.

On February 28, 1986, Dworken met with Cunniff and Spaulding at a hotel in Portland. This meeting and subsequent sessions in the hotel were videotaped surreptitiously. Dworken said that customers in Boston, New Haven, New York, Florida and Philadelphia were prepared to divide up the entire shipment, and suggested a price of $300 per pound. Dworken showed Cunniff his list of customers, each of whom allegedly could handle thousands of pounds of marijuana. Dworken later suggested a price of $350 per pound, with Dworken and Cunniff to share a profit off the top. Dworken offered to have several customers come to Maine to view the drugs.

tion.

Following further telephone negotiations, Dworken met again in Portland with Cunniff on March 4th. Dworken had enticed several potential buyers to come to Portland to view the marijuana and negotiate for its purchase. He described them in detail to Cunniff, explaining that each was experienced in these matters. Dworken insisted that they could, collectively, purchase the whole load, but that they refused to make payment in Maine. This detail became a continuing obstacle to final agreement among the players.

Dworken then proceeded to introduce each of the buyers to Cunniff. The first two to enter the scene were appellant Rogove and one "Neal" (Jay Brovender), who had traveled up from New York. They negotiated at length with Cunniff, viewed a sample of the marijuana,[1] and made particular offers for the narcotics. No precise agreement was reached.

Various other potential buyers proceeded over the next day and a half to come to the hotel to meet with Cunniff and/or Spaulding. These included Charles "Chuck" Zwalley, Mitchell Goldberg, William Greer, Robert Messina, Ed Schultz–Herda, and Frank Toscano. Dworken mediated the negotiations as "middleman." The negotiations were marked by varying degrees of seriousness, detail, ambiguity and equivocation.

The final "customer" was appellant Gay, who met with Cunniff on March 5th. Gay inspected the drugs, bargained with Cunniff and Dworken, and bragged of being able to sell "a lot of pot." Gay tentatively agreed to certain details of a purchase, contingent on certain arrangements and the assent of his "partner."

The next day Dworken called Cunniff to confirm commitments that he allegedly had received from all of the buyers who had visited. Dworken and Cunniff agreed to meet in Maine the next day, March 7th. On that day, however, evidently some or all of the players had developed cold feet, fearing that Cunniff was a law enforcement official. In particular, they were wary because of Cunniff's insistence that the money be delivered in Maine. After a heated telephone call between Cunniff and Dworken that afternoon, the deal seemed to be dead. That night, however, Rogove and Dworken called Cunniff again to try to reach a compromise. Over the next twenty-four hours, Rogove, Dworken and Cunniff tried to hammer out an acceptable deal over the phone. These conversations were recorded. When the agent continued to refuse to consummate the transaction in New York, the deal finally fell through.

## II. PROCEDURAL HISTORY

Dworken and all of the prospective customers were indicted together for conspiring to possess narcotics with the intent to distribute them. The government's theory was that there was one large, overall conspiracy amongst them to purchase the entire load. They were also accused individually of attempting to possess those narcotics with the intent to· distribute, and Dworken was charged with actual possession. Rogove and Dworken were, in addition, accused of using a communication facility to commit violations of the narcotics laws. Goldberg pleaded guilty to attempt prior to trial, and became a cooperating government witness. Brovender and Zwalley have yet to be apprehended. The seven remaining defendants went to trial on January 8, 1987.

Following trial, the court directed verdicts of acquittal on the attempt charges against Messina, Greer, and Schultz–Herda. The jury found all seven defendants not guilty of the conspiracy count. The three appellants here were each found guilty of attempting to possess over 50 kilograms of marijuana with the intent to distribute. 21 U.S.C. §§ 841(a), 846. Rogove and Dworken were also convicted on two counts each of using a communication facility in the attempted possession. 21 U.S.C. § 843(b). Dworken was found guilty of simple possession as well. 21 U.S.C. § 844(a). The jury deadlocked on

---

1. Dworken removed a sample from the bales of marijuana that Cunniff displayed. This became the primary evidence for the possession charge against Dworken.

Toscano's attempt count, and a mistrial was declared on that charge.

Appellants raise several issues on appeal. First, they each claim that the evidence against them was insufficient to allow a guilty verdict on attempted possession. They argue in essence that their behavior constituted "mere" preparation, rather than attempt. Second, they contend that their various statements should not have been admitted as evidence against one another, arguing that there was insufficient evidence of conspiracy to characterize the utterances as co-conspirator statements. Third, they argue that evidence of Dworken's behavior in relation to his original importation scheme with Cunniff (made the subject of a separate indictment and trial) should not have been admitted because of undue prejudice. Fourth, appellants assert that the prosecution improperly focused attention on codefendant Goldberg's guilty plea in order to taint them with guilt by association. Finally, Dworken claims that he was improperly prohibited from presenting a defense case when the court denied him the right to play for the jury an audiotape of one of his telephone calls with Cunniff.

We address each of these contentions in turn.

### III. SUFFICIENCY OF THE EVIDENCE

Appellants' first complaint is that there was insufficient evidence to support their convictions on the attempted possession charges. Appellants were convicted under 21 U.S.C. § 846 of attempting to possess, with the intent to distribute, more than 50 kilograms of marijuana. The statute merely provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy." There is no statutory definition of attempt anywhere in the federal law. *United States v. Rivera–Sola*, 713 F.2d 866, 869 (1st Cir.1983).

The invariably elusive nature of what constitutes an "attempt" has long been the subject of judicial chagrin. "Eminent judges have been puzzled where to draw the line, or even to state the principle on which it should be drawn...." O.W. Holmes, Jr., *The Common Law* 68 (1881). This difficult subject has occasioned an array of inconsistent approaches and outcomes in the caselaw. A more recent commentator has characterized the law of attempts as "a complete obstacle to intelligible judicial speech and an encumbrance on intelligent judicial action." T. Arnold, *Criminal Attempts—The Rise and Fall of an Abstraction*, 40 Yale L.J. 53, 79 (1940).

Nevertheless, most federal courts have in recent years attempted to achieve a modicum of consistency by adhering to the doctrine of attempts developed in the Model Penal Code. *See, e.g., United States v. Rivera–Sola*, 713 F.2d 866, 869 (1st Cir. 1983); *United States v. Manley*, 632 F.2d 978, 987 (2d Cir.1980); *United States v. Mandujano*, 499 F.2d 370, 376–77 (5th Cir. 1974); *United States v. Williams*, 704 F.2d 315, 321 (6th Cir.1983); *United States v. Joyce*, 693 F.2d 838, 841 (8th Cir.1982); *United States v. DeRosa*, 670 F.2d 889, 894 (9th Cir.1982); *United States v. McDowell*, 705 F.2d 426, 427–28 (11th Cir.1983). The Model Penal Code standard for attempt, in circumstances such as those found in the present case, is as follows: "A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he ... purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." American Law Institute, Model Penal Code § 5.01(1)(c) (1985).

The function of this definition is to make amenable to the corrective process those persons who have manifested a propensity to engage in dangerous criminal activity. Model Penal Code art. 5, Introduction, at 294; Wechsler, Jones & Korn, *The Treatment of Inchoate Crimes in the Model*

*Penal Code of the American Law Institute: Attempt, Solicitation, and Conspiracy,* 61 Colum.L.Rev. 571, 572 (1961) [hereinafter Wechsler, et al., *Treatment of Inchoate Crimes* [2] ]. This approach furthers one of the animating purposes of the Code—to develop a legal basis for dealing with individuals whose conduct indicates that they are disposed toward future criminal activity. "Conduct *designed* to cause or culminate in the commission of a crime obviously yields an indication that the actor is disposed towards such activity, not alone on this occasion but on others." *Id.* (emphasis supplied).

■ Thus, the Code's standard for attempt is focused on discerning a significant intent or design to commit crime generally, and not on how near the individual was to completing the particular crime attempted. Under the Code's standard, individuals with serious criminal propensities are identifiable, and may be convicted, upon proof of two elements: (1) an intent to engage in criminal conduct and (2) conduct constituting a "substantial step" toward the commission of the substantive offense *that strongly corroborates the criminal in-*

tent. *See Rivera–Sola,* 713 F.2d at 869. If the substantial steps are themselves the sole proof of the criminal intent, then those steps unequivocally must evidence such an intent; that is, it must be clear that there was a criminal design and that the intent was *not* to commit some non-criminal act.[3] We will examine the evidence against each of the appellants to determine whether the government presented sufficient evidence from which the jury could reasonably have found that this standard was met.[4]

### A. *Rogove*

On March 4, 1986, Rogove travelled with his cohort "Neal" from New York to Portland to meet Dworken and Agent Cunniff. Rogove admits that this meeting was for the purpose of discussing the possibility of a drug deal. Neal told Agent Cunniff that "[i]t comes down to the product, and price." Rogove himself insisted on seeing the drugs, stating, "You know the whole thing is that we want a thing to see, to know whether we're enthusiastic.... We want to leave enthusiastic." The group (Dworken, Rogove, Neal, Cunniff and Trooper Spaulding) went to the Maine Mall to view a sample of the marijuana. Rogove later

2. This article was written by the Chief Reporter and Special Consultants of the Model Penal Code, and was substantially adopted in the official commentary to the Code. Where possible, citation will be given to both the Code and the article.

3. If there is separate evidence of criminal intent independent from that provided by the substantial steps (e.g., a confessed admission of a design to commit a crime), then the substantial steps need not themselves be unequivocally indicative of criminal intent—they must merely corroborate that intent. *See* Model Penal Code Part 1, s 5.01, comment at 330–31; Wechsler, et al., *Treatment of Inchoate Crimes,* 61 Colum.L. Rev. at 593–95. The corroborative behavior is, however, always a required element; without it, "firmness of purpose" cannot be guaranteed. That is, until the corroborative step is taken, there is insufficient indication, or proof, that the actor would actually follow through on a criminal design, even if that design has been affirmatively expressed. "The act of execution is important so far as it verifies the firmness of the intent. No act of specific contours is necessary to constitute the attempt, for any act will suffice to demonstrate the actor's commitment to carry out his criminal plan." G. Fletcher, *Rethinking Criminal Law* § 3.3.1, at 138 (1978).

4. Counsel for Rogove suggested at oral argument that it is improper for a federal appellate court to adopt, as federal criminal common law, the Model Penal Code's definition of attempt. This is a provocative argument, but unavailing. First, it was not raised below or in the briefs on appeal. We normally will not consider an argument raised for the first time at oral argument, *see Pignons S.A. De Mecanique v. Polaroid Corp.,* 701 F.2d 1, 3 (1st Cir.1983), especially where, as here, the issue is one that demands extensive briefing and argument.

Second, the law of attempt has been developed exclusively through "common law": Congress has never specified the standards that are to be applied. Given that this is so, we adopt the Code's formulation because it seems to us to make the most sense. We agree that "the only rational function of the law of attempts must be the identification of individuals whose overt behavior manifests dangerous criminal propensities." Note, *Why Do Criminal Attempts Fail? A New Defense,* 70 Yale L.J. 160, 160 (1960). Until we are persuaded that some other standard would better reflect the purposes of the criminal law, we will retain fealty to the Model Code criterion.

rejected an offer of $360 per pound, but suggested a price of $320 per pound. Neal said, "I'll tell you right out to your face. We want it at 320. We both can take a dime."

Neal and Agent Cunniff then proceeded to haggle over price and quantity. It is clear from the tapes that Neal was speaking for both himself and Rogove, together as joint venturers. Rogove bragged that "we and us guys are a team and we are gonna combine forces and we're gonna turn this into green.... [Y]ou gotta negotiate a price to get this to be ... viable." They all continued to bicker over the price, Neal and Rogove refusing to budge from their $320/pound offer. Neal boasted, however, of having easy access to a quarter million dollars for payment on the "first few thousand pounds." Neal and Rogove left Maine without reaching a deal with Cunniff and Dworken. But the tone of the conversations is clear: Neal and Rogove were very interested in the possible deal, but were wary about the price and quality of the drugs.

Cunniff testified that three nights later he was phoned by Dworken and Rogove from New York. Rogove tried to persuade Cunniff to work out an acceptable deal. He said that although earlier he was prepared to take delivery on only 10,000 pounds, he was now willing to purchase 12,500. He offered $290 per pound, but refused to come up to Maine to consummate the deal. In a conversation shortly thereafter, Rogove said that he would be able to come up with a million dollars in cash as a down-payment, and asked that the marijuana be shipped the next day. Subsequent conversations in phone calls later that night contained further negotiations between Cunniff, Dworken, Rogove and Neal.

Several more phone conversations followed the next day. (Cunniff was contacted by Rogove several times in the course of a 24–hour period.) Rogove boasted that he had three and one half million dollars available, but noted his suspicions of the details of the deal. He said that he wanted to make money and did not want the deal to fall apart. Later, Rogove claimed to want to dissociate himself from Dworken, and to deal independently with Cunniff. In one conversation, Rogove spoke to Cunniff's associate, Agent Festa, who was impersonating Cunniff's "boss." Rogove agreed to post a $500,000 down-payment on the deal. Rogove later told Cunniff that he would show the half-million dollars at a meeting in Boston. Later that evening, Rogove assented to bringing Dworken back into the deal as broker, and suggested that Cunniff contact Dworken. Dworken later insisted that Cunniff come to New York to see the down-payment. Cunniff refused, and the negotiations were broken off.[5]

We have no trouble concluding that this extensive behavior both evidences and strongly corroborates a design to engage in criminal activity. There is no question but that what Rogove was doing was *trying* to work out a narcotics transaction. This endeavor was neither frivolous nor tentative. Rogove took great pains to pursue the deal and to pressure Cunniff to accept the transaction on Rogove's terms.

Rogove argues, however, that this evidence fails to establish either element (intent and corroborative substantial step) of the specific crime of attempt. As to intent, Rogove's claim, in essence, is that his intent to commit the substantive offense was conditional. Rogove focuses on the fact that he and Cunniff never reached agreement on the terms of the sale; *all* they did was negotiate.

■ We do not accept Rogove's theory of provisional intent. In all unconsummated crimes, the intent to complete the crime is contingent on certain conditions precedent. For example, a bank robbery plan will be carried out only *if* there are no law enforcement officials in the area, and *if* the

5. This description of the evidence does not include any statements by Dworken concerning Rogove's intentions. Rogove claims that those statements should not be considered adoptive admissions because Dworken had motive to exaggerate and fabricate in order to "broker" the deal between Cunniff and the buyers. We express no opinion on the probative value of those statements. Our analysis proceeds independently of them.

plan progresses as anticipated. The question therefore becomes *which* conditional intents demonstrate the requisite propensity to engage in criminal activities. *Cf. United States v. Anello*, 765 F.2d 253, 262–63 (1st Cir.1985) (for purposes of criminal conspiracy, virtually all agreements are, to some extent, conditional; test for conspiratorial liability should focus on likelihood that condition precedent will be fulfilled). In keeping with the principles of the Model Penal Code, we hold that liability should attach if the defendant reasonably believed that the conditions would obtain.[6]

There is no question here but that Rogove reasonably thought that he could work out a successful transaction. He and Neal made continuous and serious offers to Cunniff regarding the price and specifications of the deal. Rogove haggled over price, quality, volume, and location. He was prepared to make the deal, *as long as Cunniff agreed to his terms.* The jury could reasonably have found that Rogove "affirmatively desire[d] to engage in the conduct or ... cause the result that w[ould] constitute the principle offense." Model Penal Code Part 1, § 5.01, comment at 301. The possession of marijuana for the purpose of selling it was the objective of Rogove's actions, and he had every reason to believe that there was a reasonable likelihood that he would realize his goal. Even if his actions did not indicate a propensity to purchase narcotics under those conditions specified by Cunniff, they left no doubt that Rogove was ready and willing to purchase on his own terms. This satisfied the government's burden of showing the requisite intent.[7]

Rogove next insists that he did not take the substantial steps necessary to strongly corroborate the seriousness of the culpable intent. He claims that his actions did not rise beyond the level of "preparation," which allegedly is insufficient for attempt liability.

It has long been acknowledged that it is difficult, if not impossible, to distinguish preparation from attempt, and that "attempt" in fact includes much preparatory conduct. *See* Hall, *Criminal Attempt—A Study of Foundations of Criminal Liability*, 49 Yale L.J. 789, 821–22 (1940). *See also United States v. Coplon*, 185 F.2d 629, 633 (2d Cir.1950) (Judge Learned Hand) ("The decisions are too numerous to cite, and would not help much anyway, for there is, and obviously can be, no definite line [between preparation and attempt].") The Model Penal Code has essentially eliminated the distinction. *See also* Wechsler, et al., *Treatment of Inchoate Crimes*, 61 Colum.L.Rev. at 612 (discussing breakdown of distinction); Levenbook, *Prohibiting Attempts and Preparations*, 49 UMKC L.Rev. 41 (1980) (advocating elimination of legal distinction).

We previously have suggested that the important question is not whether something constitutes "preparation" or "attempt," but whether the behavior does strongly corroborate clear criminal intent. We have held that in order to constitute a substantial step leading to attempt liability, an actor's behavior must be " 'of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in

---

6. If there is virtually no chance that the condition would be fulfilled, such as if Rogove were only willing to purchase marijuana for three cents per kilogram, then liability should not attach, because it would be unreasonable to believe that the conditions would ever be fulfilled. In such a case, there is virtually no likelihood that the defendant presents any risk of actual dangerousness, even if there is in some sense an "intent" to commit a crime.

7. It may be true, as Rogove contends, that *"mere consideration of a crime ... is not actionable."* Rogove Brief at 18 (emphasis supplied). For instance, if Rogove had "merely" come up to Maine, heard Cunniff's offer, rejected it and left,

this would be a much more difficult case, because Rogove's desire to buy would be highly speculative. We do not express any opinion about culpability in such an instance. That is not, however, this case. Here, Rogove and his confederate engaged in extensive negotiations over the narcotics, and offered enormous amounts of money for it. They viewed the drugs, haggled over price and amount, and initiated numerous conversations during which negotiations took place. We would be hard-pressed to say that the jury could not interpret this behavior as evidence of serious intent to purchase, rather than "mere" consideration.

accordance with a design to violate the statute.' " *Rivera–Sola,* 713 F.2d at 870 (quoting *Manley,* 632 F.2d at 988).[8] This standard was adapted almost verbatim in the court's charge to the jury in this case. We find that there was overwhelming evidence to support the jury's verdict on this question—almost all of Rogove's behavior in connection with the events described at trial could have been undertaken *only* "in accordance with a design to violate the statute." Indeed, there is little if any identifiable *non*-criminal design that could have been the focus of such acts.

■ Rogove's final and most substantial argument, and one that underlies all of his contentions as to attempt, is that he should not be held liable because, even if he *did* attempt to possess the narcotics, he abandoned that attempt of his own accord. Abandonment is a defense that we have acknowledged but never firmly adopted or rejected as a basis for reversal. *See United States v. Bailey,* 834 F.2d 218, 226–27 & n. 7 (1st Cir.1987). Assuming arguendo that such a defense might in some circumstances be recognized, we find that Rogove has failed to establish such a defense here.

The theory of abandonment is that certain behavior indicates a renunciation of criminal intent, such that the dangerousness manifested by the criminal attempt is no longer viable. The Model Penal Code provides that:

> When the actor's conduct would otherwise constitute an attempt ..., it is an affirmative defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose.

Section 5.01(4). This standard provides dual criteria for the renunciation of criminal purpose: it must be both complete and voluntary. The Code explains:

> [R]enunciation is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the actor's course of conduct, that increase the probability of detection or apprehension or that make more difficult the accomplishment of the criminal purpose. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct until a more advantageous time or to transfer the criminal effort to another but similar objective or victim.

*Id.* If a defendant introduces evidence that his renunciation was complete and voluntary, the prosecution would have the burden, under the procedure recommended by the Code, to prove that the behavior was not voluntary and complete. Model Penal Code Part 1, § 5.01, comment at 358–59; Wechsler, et al., *Treatment of Inchoate Crimes,* 61 Colum.L.Rev. at 617.

Rogove failed to meet his burden of production here. Even if we assumed that his renunciation was voluntary, as that term is intended in the Model Penal Code,[9] he presented no evidence even to suggest that it was complete. The abandonment cannot be "temporary or contingent," Model Penal Code Part 1, § 5.01, comment at 358; Wechsler, et al., *Treatment of Inchoate Crimes,* 61 Colum.L.Rev. at 616–17; it must instead be a "change of heart." Model Penal Code Part 1, § 5.01, comment at 356; Wechsler, et al., *Treatment of Inchoate Crimes,* 61 Colum.L.Rev. at 615. Rogove does not claim that his abandonment here was categorical or complete; he was

---

**8.** The Model Penal Code, in section 501(2), enumerates various typical sorts of substantial steps that should not be held insufficient as a matter of law as long as they strongly corroborate criminal purpose. These "steps" include such things as lying in wait, reconnoitering the location of the crime, unlawful entry, and possession of incriminating materials under certain circumstances. Undoubtedly because attempted possession of narcotics was not common at the time that the Code was prepared, negotiations for purchases is not among the non-exclusive list in section 501(2). But such negotiations are, we think, analogous to those behaviors cited in the Code, and should not be held as a matter of law insufficient as substantial corroborative steps.

**9.** This is a presumption about which we express no definitive opinion—the evidence could easily be read to indicate that Rogove backed out of the deal because he suspected that Cunniff might not be what he appeared to be.

not renouncing a life of drug dealing. He was merely unsatisfied with the terms and conditions of Cunniff's particular offer. He was thwarted not by a change of heart, but by his inability to persuade Cunniff to adopt his preferred terms. His abandonment was, therefore, particular to this transaction, and not to possession of narcotics generally. The defense of renunciation is unavailing.

In sum, the evidence was sufficient to allow the jury to find that Rogove had attempted to possess narcotics for the purpose of delivering them, and Rogove failed to offer evidence of the sort of renunciation that would negate the presumption of dangerousness evidenced by his attempt.

Though no decision in this muddled area could possibly be consistent with all prior cases, we are supported in our holding by numerous decisions from other circuits finding attempt in analogous circumstances. *See, e.g., United States v. Manley,* 632 F.2d 978 (2d Cir.1980) (defendant brought considerable amount of cash to home of prospective seller and was found running from a room in which cocaine was being weighed); *United States v. Rivero,* 532 F.2d 450 (5th Cir.1976) (defendant gave sample of cocaine to prospective buyer, offered jewelry for collateral on a downpayment, and agreed on a price); *United States v. Mandujano,* 499 F.2d 370 (5th Cir.1974) (defendant requested and received $650 for ostensible purchase of heroin); *United States v. Williams,* 704 F.2d 315 (6th Cir.1983) (defendant inquired into possibility of purchasing cocaine, and arrived at putative seller's house with $3400); *United States v. Mazzella,* 768 F.2d 235 (8th Cir.1985) (defendant ordered and received precursor chemicals for manufacture of amphetamines, but had not started to manufacture); *United States v. Scott,* 767 F.2d 1308 (9th Cir.1985) (defendant called putative seller expressing interest in purchasing cocaine, and brought $4500 to agreed upon place of sale); *United States v. DeRosa,* 670 F.2d 889 (9th Cir.1982) (defendants arranged and coordinated sale of

cocaine, but backed out when they became suspicious of police presence); *United States v. Johnson,* 767 F.2d 673 (10th Cir. 1985) (defendant sent $15,000 for purchase of phenylacetone); *United States v. McDowell,* 705 F.2d 426 (11th Cir.1983) (defendant negotiated sale for kilogram of cocaine, but backed out of deal, before paying, after DEA agent refused to let him sample narcotics).[10]

The most significant support, however, comes from *United States v. Rivera–Sola,* in which we upheld an attempt conviction in circumstances analogous to those we find here. The defendant in *Rivera–Sola* asserted to DEA agents that he was trying to raise money to purchase quaaludes, explained an elaborate distribution scheme, had numerous meetings and conversations with DEA agents and informants, and tested a sample of drugs. The defendant then became suspicious of the agents and cut off negotiations. In this case, Rogove asserted that he *had* the money to purchase the narcotics, negotiated at length for acceptable terms, came to Maine to deal with Cunniff, viewed the marijuana, and continued to dicker with Cunniff over price, quantity and location in numerous phone calls over a two-day period. He made several substantial, though conditional, offers to purchase. We cannot say that there is any material difference between this case and *Rivera–Sola.* The indicia of intent and the substantial corroborative steps were just as, if not more, substantial in the instant case. There was no ambiguity about what Rogove was trying to accomplish.

Rogove cites *United States v. Joyce,* 693 F.2d 838 (8th Cir.1982), and *United States v. Delvecchio,* 816 F.2d 859 (2d Cir.1987), as authority for reversal here. In *Joyce,* the defendant flew from Oklahoma City to Saint Louis to meet with DEA agents posing as drug dealers. He was carrying $22,-000 in cash. Joyce asked to see the cocaine, and said he could "handle" a pound for $20,000. He desisted in his effort to buy when the agent refused to open for

---

**10.** At least two of these cases, *DeRosa* and *McDowell,* found attempt even though the defendant technically had "withdrawn" from the

deal of his own accord. The latter case is very similar to the instant one.

inspection the package allegedly containing the cocaine. The appeals court held that Joyce had "aborted" his attempted possession when he "abandoned" his intention prior to the commission of a "necessary" step in the transaction, namely, handing over the money. 693 F.2d at 841. The court concluded that no attempt had been made.

In *Delvecchio*, the defendant had agreed, at a meeting with undercover DEA agents, to purchase five kilograms of heroin from the agents for nearly one million dollars. He never showed up for the agreed upon follow-up meeting, and later claimed to be "not comfortable" with the deal. The court held that "verbal agreement alone, without more, is insufficient as a matter of law to support an attempt conviction." 816 F.2d at 862.

We think that both of these cases are distinguishable from the instant case, for the simple reason that Rogove did far more than either Joyce or (especially) Delvecchio to corroborate his criminal designs. But insofar as these two cases purport to establish a different standard from that we have adopted here, we must respectfully disagree with their analyses. In both cases, we think, the defendants' attempt was established by their very clear efforts to purchase narcotics. Each then abandoned this attempt. In each case, however, the abandonment seemed to be triggered by fear of apprehension rather than by any change of heart. There was no complete and voluntary renunciation of the general criminal intent to possess narcotics, merely a desisting in the attempts to purchase the narcotics in question, for fear of government involvement.[11]

### B. *Gay*

■ Once we have established the basic contours of our analysis along the lines

described above, we have no difficulty concluding that there also was sufficient evidence to support Gay's conviction. Gay also traveled up to Maine to meet with Cunniff. In a videotaped meeting, he grilled Cunniff on whether he was a law enforcement official. He then bragged that "I can sell a lot of pot and I've sold a lot of pot." Gay inspected two samples of marijuana, and began to bargain with Cunniff and Dworken over the amount and price of the sale. He claimed to be able to "sell whatever you have not committed up to this point.... in probably about a month." He offered a downpayment of $250,000 to $500,000, but suggested that he would reject the drugs if they were not up to his desired quality. He made an offer of $300 per pound, and tentatively agreed to take 30,000 pounds. Gay attempted to get Cunniff to come to New York to receive the down-payment, but Cunniff resisted. Gay admitted that the acceptable details of a possible deal had been "worked out" by his "group" before he came to Maine. Cunniff was to send the marijuana to Gay's own warehouse for inspection and transfer. Gay agreed to take delivery "by Friday," and to transfer the money after he had seen the goods. He bragged repeatedly about his ability to handle, or "get rid of," 30,000 pounds. Gay finally stated that he would discuss Cunniff's offer with "his partner," and "come back to you and I'll give you my counter proposal."[12]

It is eminently clear that Gay intended to purchase a large quantity of marijuana. His negotiations, offers, counterproposals, and agreements clearly indicate and corroborate a serious design to possess with intent to distribute. Like Rogove, Gay would purchase only on certain conditions, but as we have explained above, contingent

---

**11.** It could be argued that Delvecchio met his burden of showing voluntary abandonment, and that the government did not satisfy its burden of proving that his renunciation was caused by fear of apprehension rather than by a change of heart. The facts as reported are too sketchy for us to make this determination. In any event, even if Delvecchio should have been exonerated on an abandonment defense, we think that the Second Circuit probably was mistaken in con-

cluding that no clear attempt previously had been made to purchase the drugs.

**12.** Once again, this summary does not include statements made by Dworken that incriminated his fellow appellant. With those statements, Gay's attempt becomes even clearer, but they are not necessary to our analysis.

intent does not negate criminal intent unless it is unreasonable to assume that the conditions precedent will be met. In this case, Gay had every reason to believe that his conditions were reasonable; indeed, he expended much energy attempting to persuade Cunniff that they were more reasonable than those suggested by Cunniff himself. The jury was justified in finding that Gay had attempted to possess narcotics for the purpose of distributing them.

### C. *Dworken*

■ The nature of Dworken's attempt was a bit different from that of his customers. Dworken was one step up in the chain of distribution for the narcotics. He was the broker between Cunniff and the various purchasers/distributors. Dworken laid plans to transport, unload, inventory, and distribute much of the marijuana that was to go to his purchasers. He claimed to have located two storage facilities in Connecticut in which the drugs could be stored. He was the link between Cunniff and the buyers; the marijuana would be sold through him.

His intent cannot be disputed. He, more than any other defendant, was the central player in the negotiations with Cunniff. He recruited numerous individuals to be a part of the scheme, and mediated the negotiations between those individuals and the putative seller. There can be no doubt that his intent was to facilitate the sale of large quantities of marijuana. He inspected the drugs. He persuaded eight individuals to come to Maine to negotiate a deal for the load. He often reassured buyers when they became disenchanted with the deal. He offered to provide the warehousing for the drugs on route from Maine to their destinations. He organized the various distribution schemes for the twenty to twenty-six and a half tons of marijuana. After the negotiations in Maine, he continued to barter with Cunniff by telephone from New York, so that his buyers and Cunniff could come to a mutually desirable compromise.

These numerous very substantial steps strongly corroborate Dworken's intent to broker the deal. He did all that was in his power to attempt to realize his criminal design; the only reason it was not achieved was that negotiations among the other players eventually stalemated.

## IV. CO–CONSPIRATORS' STATEMENTS

Appellants contend that various statements by purported co-conspirators were unreliable hearsay, and should not have been admitted. The appellants challenge the district court's rulings that many of Dworken's statements were admissible against the purchasers and that the purchasers' statements were admissible against Dworken.[13]

### A.

■ The jury acquitted all defendants of the joint conspiracy count. Appellants argue that the charge should have been resolved on a directed verdict, because there allegedly was no evidence to support the government's theory of one overarching conspiracy involving Dworken and the various buyers. Essentially appellants argue, and apparently the jury agreed, that Dworken engaged in several *separate* agreements with various individuals to come to Maine to investigate the possibility of drug transactions. Thus, they reason, without proof of the *charged* conspiracy, the "co-conspirator" statements should not have been admissible on the remaining counts of the indictment.

Even if we presume that the government failed to prove by a preponderance that the particular sort of scheme fashioned by Dworken was a single conspiracy, appellants' theory is otherwise flawed. It is true, as appellants contend, that if the evidence could be interpreted only to show

---

13. Presumably, those statements that were made to Cunniff in the presence of the persons to whom the statements referred were admissible as adoptive admissions of those persons. *See* Federal Rule of Evidence 801(d)(2)(B). Our discussion, therefore, concerns only those statements that were made outside the presence of the alleged co-conspirators. For the most part, these are statements made by Dworken about Gay and Rogove.

discrete, individual agreements between Dworken and *each* potential buyer, the district court would have erred in denying a directed verdict, because the government would have failed to prove the charged conspiracy. Instead, the evidence would merely have demonstrated a classic "hub and spoke" organization, *see Kotteakos v. United States*, 328 U.S. 750, 754–55, 66 S.Ct. 1239, 1242–43, 90 L.Ed. 1557 (1946), with Dworken at the center and each of the potential purchasers at the periphery, "without the rim of the wheel to enclose the spokes." *Id.* 328 U.S. at 755, 66 S.Ct. at 1243. "The proof therefore admittedly [would have] made out a case, not of a single conspiracy, but of several, notwithstanding only one was charged in the indictment." *Id.*

The issue of a directed verdict is not, however, before us, since the jury acquitted appellants on the conspiracy charge. Appellants, however, claim not only that a directed verdict was required but also that the propriety of such a directed verdict should have necessitated the co-conspirators' statements being excluded from evidence. But this does not necessarily follow. As the *Kotteakos* quotation above indicates, there would still be in such a case, as there is here, evidence of *several* separate conspiracies. That is, each of the buyers individually conspired with Dworken. If this were so, Dworken's statements regarding each buyer would be admissible as to that buyer under Federal Rule of Evidence 801(d)(2)(E).[14] That there may have been, as Rogove claims, "no interdependence among the various participants," Reply Brief at 19–20, is, therefore, immaterial to the issue of admissibility of co-conspirator statements. The existence of the particular conspiracy charged in the indictment is not necessary for admission of coconspirator statements. Indeed, no conspiracy need be charged at all. " 'It is well established that the applicability of the 'coconspirator' exception to the hearsay rule is not conditioned on the presence of a conspiracy count in the indictment.' " *United States v. Munson*, 819 F.2d 337, 343 (1st Cir.1987) (quoting *Ottomano v. United States*, 468 F.2d 269, 273 (1st Cir. 1972)).

Moreover, the district judge found, at least implicitly, that a preponderance of the evidence demonstrated the existence of the individual conspiracies. In finding that there likely was one overarching, collective conspiracy, the court inferred from the evidence that Dworken had, after his initial conversations with Cunniff, gone to New York and prompted each of the potential buyers to go to Maine to be part of the scheme.[15] There is a presumption in such an analysis that each of them, including Rogove and Gay, agreed to join Dworken's plan, at least insofar as it entailed discussions with Cunniff regarding the narcotics. Indeed, there is no way, under these facts, that the trial judge could have found a joint conspiracy *without* finding separate agreements between Dworken and each of his recruits. We therefore find no error in the admission of Dworken's statements as coconspirator statements as to Rogove and Gay, or vice versa.

## B.

■ Appellants make several further arguments challenging the admission of the co-conspirator statements. Most significantly, Rogove (joined by Gay) argues that even if there *were* individual agreements between Dworken and the buyers, they were merely agreements to travel to Maine to inquire about and negotiate a transaction, i.e., that there were no agreements to

---

**14.** Under this theory, Dworken's statements regarding separate conspiracies with *other* buyers would not be admissible against those buyers who were not the subject of those statements (and theoretically not members of that conspiracy). But we do not see how the jury could possibly have used Dworken's statements as to other recruits as probative evidence of Rogove's and Gay's attempts to possess. Thus, the absence of a limiting instruction in this regard, if error, would have been immaterial and harmless on the attempt count. *See United States v. Silvestri,* 790 F.2d 186, 194 (1st Cir.1986).

**15.** Because it is unnecessary to our decision, we make no ruling on whether the district court erred in finding that the overall, "joint" conspiracy charged had been demonstrated by a preponderance of the evidence.

*purchase.* Therefore, it is argued, there were no *illegal* conspiracies, and the statements should have been excluded.

Arguably, a conspiracy to *attempt* to possess narcotics would not itself be illegal. Nothing in 21 U.S.C. § 846, which proscribes both conspiracy and attempt, forecloses the possibility that one could be guilty of conspiring, under section 846, to violate section 846 by attempting to violate some other section of the narcotics laws.[16]

But even if such a "double 846" violation were not illegal, we still find that a preponderance of the evidence supported a reasonable inference that the individual buyers separately had conspired with Dworken to possess narcotics provided certain conditions precedent were met. "[A]greement to buy [narcotics] that is conditional is nonetheless for conspiracy purposes an agreement to buy, at least as long as the potential buyer believes the condition likely to be fulfilled." *United States v. Anello,* 765 F.2d 253, 262 (1st Cir.1985). It is clear from the evidence that Dworken, Gay and Rogove all believed that there was at least a likelihood that they would successfully negotiate an agreement with Cunniff. Therefore, the court would not be in error in determining that a preponderance of the evidence demonstrated conspiracies between Dworken and each of the other two to possess narcotics with the intent to distribute.

### C.

■ Next, appellants contend that there was no independent evidence, apart from the statements themselves, that demonstrated the existence of the conspiracy. Although the statements themselves may be used in determining the existence of the conspiracy for the purpose of admitting those statements, *see Bourjaily v. United States,* —— U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), we have not yet decided in this circuit whether such statements may be the *sole* evidence used to establish the existence of the conspiracy. Before *Bourjaily,* however, we did require that "significant independent evidence of the existence of the conspiracy" be established, even if the challenged statements are themselves used. *United States v. Martorano,* 561 F.2d 406, 408 (1st Cir.1977). We allowed district courts to "consider the independent evidence in the light of the color shed upon it by the highly trustworthy and reliable portions of the hearsay utterance seeking admission." *Id.* In an earlier incarnation of the same case, we explained:

> [W]here there is significant independent evidence of the existence of a conspiracy and where the statement seeking admission simply corroborates inferences which can be drawn from the independent evidence, we see no problem with the consideration of that statement.

*United States v. Martorano,* 557 F.2d 1, 12 (1st Cir.1977). *See also Bourjaily,* 107 S.Ct. at 2783–84 & n. 2 (Stevens, J., concurring) ("otherwise inadmissible hearsay statement *cannot* provide the *sole* evidentiary support for its own admissibility") (emphasis supplied); *id.* 107 S.Ct. at 2781–82 (majority opinion) (reserving judgment on this question).

Even if independent evidence is after *Bourjaily* still required for a finding of conspiracy, the government has met that standard here. Dworken's statements amply support inferences of the conspiracies that can be drawn from the extensive actions of those defendants and from the defendants' *own* statements regarding their interrelationships. Each of the appel-

---

**16.** *United States v. Melchor–Lopez,* 627 F.2d 886 (9th Cir.1980), cited by appellants, is not to the contrary. In that case, defendant Kommatas was convicted of conspiring to import and possess narcotics with the intent to distribute. The Ninth Circuit, finding that there had been merely an agreement to negotiate a purchase, rather than an agreement to purchase, ruled that "[t]he law requires more than a conspiracy to attempt to arrange a purchase; it requires an agreement to carry out an illegal act." *Id.* at 892.

This statement does not help appellants here. The "law" to which the court referred was the prohibition against conspiring to import and sell; the sufficiency of the evidence on the defendant's conviction for violation of *that* conspiracy was all that was at issue. The court was not ruling on whether an agreement to *attempt* to violate the law could itself be made illegal, or whether statements made pursuant to such a conspiracy to attempt could be admissible against co-conspirators.

lants demonstrated that he was associated with at least one of the others in the scheme to purchase drugs. There were constant assurances from Dworken and the customer of the moment (whether it be Rogove or Gay) to Cunniff that they were aligned with one another. Indeed, both Rogove and Gay were virtually paired with Dworken in their individual negotiation sessions. The evidence overwhelmingly manifests underlying agreements between Dworken and each of the others to become part of a transaction if the specified conditions could be met.

### D.

■ Finally, Rogove (joined by Gay) argues that even if there were conspiracies with Dworken, Dworken's statements to Cunniff out of the presence of the potential buyers were not "in furtherance of the conspiracy," as required by Rule 801(d)(2)(E). In particular, the other two appellants contend that Dworken, when left to his own devices, negotiated for his *own* benefit, even when that entailed lying about where Rogove and Gay stood on the negotiations. Under this theory, Dworken had a stake in keeping the deal alive, even when his buyers had indicated their disillusionment. He allegedly concocted scenarios for Cunniff, to which Rogove and Gay ostensibly had acquiesced, so that Cunniff would keep negotiating. Those statements, argue the two buyers, should not have been admitted to show *their* intentions to follow through on the deal.

We cannot say that the district court was clearly erroneous in finding that the statements were made in furtherance of Dworken's arrangements with the other appellants. Even if at times Dworken's primary concern might have been himself and not the joint ventures with Rogove and Gay, the statements were not so different from the words and actions of the buyers themselves that we could find the court clearly

erred in deciding that they were in furtherance of those ventures.[17]

Moreover, we have no doubt that Dworken's statements were not necessary to Rogove's and Gay's convictions. Even without Dworken's statements corroborating Gay's and Rogove's interest in the deal, the evidence overwhelmingly illustrated their intent to purchase the marijuana if they could reach terms that were acceptable. Our dissection of the evidence on the sufficiency question, *supra* section III, is without regard to those statements. It is obvious that the intent and corroborative steps were plainly established despite the exclusion of *Dworken*'s confirmatory statements. Rogove and Gay sealed their own fate.

## V. EVIDENCE OF OTHER BAD ACTS

The next area of dispute involves evidence of other illegal activity by Dworken that was admitted under Federal Rule of Evidence 404(b). The government spent the first large portion of the trial establishing Dworken's attempts to operate an international drug *smuggling* scheme. Both Dworken and his co-defendants complain that this evidence was unfairly prejudicial, despite certain limiting instructions by the court.

The challenged evidence consists of statements made by Dworken during his discussions with Cunniff about obtaining an offload site for the narcotics that Dworken allegedly was trying to smuggle into the United States.[18]

The first witness for the prosecution was Paul Guidetti, who had entered into a plea agreement with the government. Dworken had discussed with Guidetti the possibility of finding an offload site for the incoming narcotics. Guidetti testified at length concerning his own criminal past. The court did not allow Guidetti to describe the discussions between him and Dworken regarding the importation plan, but Guidetti did

---

**17.** Rogove himself, for example, continued to bargain with Cunniff by telephone, sometimes in the presence of Dworken, days after Dworken had conveyed Rogove's interest in consummating the deal.

**18.** Before trial, the court had severed a separate indictment charging Dworken with attempted possession during the smuggling endeavor.

explain how he brought together Cunniff and Dworken by explaining to Cunniff that Dworken might be a prime target for law enforcement attention.

Following Guidetti, Cunniff testified about his contacts with Dworken, detailing Dworken's attempts to find an offload site for the marijuana importation. Pretending to be a drug operative, Cunniff contacted Dworken, and suggested that he had an offload site in Maine for Dworken's narcotics. Dworken came to Maine to discuss this site, and it was there that he and Cunniff became involved in the wholly separate purchase deal that is the subject of the present case.

A tape of one of the discussions between Dworken and Cunniff on this subject, recorded on December 29, 1985, was played for the jury. Of the approximately 140 minutes heard, only a few isolated comments arguably related directly to the crimes charged in the instant case. On the tape, Dworken explained that he needed boats, coordinates for hiding places, and offload sites for two different projects, one involving marijuana from Colombia and the other hashish from the east. Dworken offered Cunniff 20% of the value of the loads for his assistance. He bragged of a hashish venture six years earlier that he had undertaken with his son. Finally, Cunniff made one reference to the load of marijuana that *he* was expecting, and Dworken expressed interest in buying a portion of it.

Cunniff then continued to testify about a meeting the next day, December 30, 1985, where Dworken described his substantial involvement in other drug smuggling over the three previous years. Other discussions between Cunniff and Dworken prior to the negotiations involved in this case concerned the details of Cunniff's offer of an offload site.

Dworken complains that the extensive evidence concerning other bad acts unfairly prejudiced his trial on a discrete narcotics transaction. His co-appellants argue that

such evidence had prejudicial spillover effect on their cases.

■ As to Dworken, the evidence was properly admissible under Rule 404(b) to provide context for the ensuing conversations between Cunniff and Dworken. It explained how the two came into contact, and why Cunniff was prompted to offer the fictitious sale to Dworken. It allowed the jury to understand the nature of the relationship between the two men, and revealed the perspectives of the two in the conversations that were to follow. Evidence may be introduced pursuant to Rule 404(b) " '[t]o complete the story of the crime on trial by proving its immediate context of happenings near in time and place.' " 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[16], at 404–118 (quoting *McCormick on Evidence* § 157 (1954)). *See United States v. Currier*, 821 F.2d 52, 55 (1st Cir.1987). As we have stated, " ' "[E]vidence of other criminal acts [is] admissible ... when [it is] so blended or connected with the one on trial as that proof of one incidentally involves the other; *or explains the circumstances thereof....* " ' " *Id.* (quoting *Green v. United States*, 176 F.2d 541, 543 (1st Cir. 1949) (in turn quoting *Bracey v. United States*, 142 F.2d 85, 87 (D.C.Cir.1944))) (emphasis supplied).

Moreover, the evidence was admissible to show that Dworken had the intent to purchase. The primary issue at trial, on both the conspiracy and attempt counts, was the nature of Dworken's intent. This is much more readily comprehended when viewed in full circumstantial context. Dworken's claim that his entreaties and inquiries were but casual explorations of a drug deal that he did not seriously intend to make is belied by the evidence of the prior endeavors. Rule 404(b) does, of course, explicitly provide that proof of intent is a proper basis for admission of such evidence. We find that the district court did not abuse its discretion in admitting the evidence as to Dworken.[19]

---

19. In the limiting instructions that it gave to the jury, the court repeatedly instructed that the evidence could be considered only on "the question of whether Mr. Dworken had an intent *or predisposition* to enter into the subsequent discussions with Mr. Cunniff about purchasing

It is perhaps true that the government could have established intent and context without so much *detail* concerning the prior discussions, but this is essentially a Rule 403 balancing decision left to the broad discretion of the trial judge. "[T]he trial court has considerable leeway in balancing any legitimate probative value that such evidence may have against its potential prejudicial effect." *United States v. Simon*, 842 F.2d 552, 553 (1st Cir.1988). The district court in this case was not at all indiscriminate in its Rules 404(b) and 403 rulings. It excluded much of the evidence regarding Dworken's past acts, especially those that occurred many years before. It did not allow Guidetti to testify regarding Dworken's other drug schemes, because such information from Guidetti was too attenuated for the purposes that the evidence was meant to serve. Cunniff, by contrast, was allowed to testify to those acts in certain detail, because they were directly relevant to the ensuing discussions between Cunniff and Dworken, and because they helped clarify Dworken's intent in those later discussions.[20] The direct use of the recordings was curtailed after the first tape, so that the evidence could be more precisely directed through the testimony of Cunniff himself. When the detail of Dworken's past acts began to accumulate, the district judge refocused the case on the indicted charges, warning the government that "you've covered [the other bad acts] adequately and anything you add to it is overkill." It is clear that the trial judge balanced probative weight against prejudice with care at each stage of the proceedings, and took precise actions to protect the defendants when there was a danger of the balance leaning too far over onto the prejudicial side. Even if hindsight suggests that the balance might have been struck slightly differently at certain points in the trial, we cannot say that the judge acted outside the scope of his broad discretion.

■ Rogove and Gay complain that the extensive evidence of Dworken's other bad acts "overwhelmed the trial," creating spillover prejudice against them. It is of course true that "[e]vidence that might be admissible under Rule 403 in a trial of one defendant is not inevitably admissible in a joint trial," and that "in some situations the danger of unfair prejudice to co-defendants may be so great that the prosecution must be put to the choice of foregoing either the evidence or the joint trial." *United States v. Figueroa*, 618 F.2d 934, 945 (2d Cir. 1980). The court must consider the "gross disparity in the quantity and venality" of the evidence against the joint defendants. *United States v. Sampol*, 636 F.2d 621, 647 (D.C.Cir.1980). Rogove, Gay and the other buyers did ask the trial court either to exclude the evidence of Dworken's other bad acts or to sever them from the Dworken trial.

As we have noted, the decision to exclude evidence of other bad acts is within the sound discretion of the trial court. Whether or not defendants should be severed from a joint trial is also a decision that is entrusted to the sagacity of the trial judge

marijuana from Mr. Cunniff." We are concerned that, absent an issue of entrapment for the jury's consideration, the use of the term "predisposition" might suggest precisely that use of the evidence explicitly proscribed by Rule 404(b), namely, "to prove the character of a person in order to show action in conformity therewith." However, no objection was made by Dworken to this instruction, so any possible exception has been waived.

**20.** Contrary to appellants' claim, these are not inconsistent rulings. It makes much more sense, for the reasons expressed in the text, that the evidence should be admitted through the testimony of and discussions with Cunniff, rather than through the recollections of Guidetti. At the time Guidetti testified, the trial court could not be sure that the other bad acts evidence would be closely enough related to the events at issue to justify outweighing any possible prejudice. The context of the acts in relation to the charged offenses was not yet established, and it can safely be said at the very least that the jury would have been distracted by this seemingly unconnected narrative at the very beginning of trial. The evidence made much more sense coming when it did, during Cunniff's explanation of how he and Dworken came to discuss the proposed sale. The trial court's distinctions in this regard are an exemplary illustration of fair case management, balancing carefully the probative benefits and prejudices at various stages of the government's case.

under Federal Rule of Criminal Procedure 14. *Opper v. United States*, 348 U.S. 48, 95, 75 S.Ct. 158, 165, 99 L.Ed.59 (1954); *United States v. Scivola*, 766 F.2d 37, 41 (1st Cir.1985). Reversal of such a decision for abuse of discretion is extremely rare. *Id.* We find that the district court did not abuse its broad discretion, either in denying exclusion of evidence of Dworken's bad acts, or in refusing to sever his codefendants.

The judge took pains to stress to the jury, on numerous occasions, that Dworken's bad acts were to be considered only as to him, and not to the other defendants. In his charge, the judge emphasized that each defendant was to be accorded distinct, individualized treatment, and instructed the jury to focus on the evidence against each defendant separately. This "scrupulous care," *see United States v. Luna*, 585 F.2d 1, 5 (1st Cir.1978), was enough to ensure that Rogove and Gay were not victims of spillover prejudice.

Moreover, the jury's discerning verdict "reflects a careful dissection of the evidence as it applied to each defendant." *United States v. Turkette*, 656 F.2d 5, 9 (1st Cir.1981). All defendants, including Dworken, were acquitted on the conspiracy count, and the jury reached an impasse on the attempt count as to defendant Toscano after extensive deliberations. Although such a discriminating verdict is not dispositive on the question of whether a severance should have been granted, *id.*, it "demonstrates the jury's ability to segregate the evidence and carefully weigh against which defendant it was applicable." *United States v. Richman*, 600 F.2d 286, 299–300 (1st Cir.1979).

As for Rogove and Gay, it is hard to see how the jury *could* have been seriously influenced by the evidence of Dworken's other schemes, which did not in any way involve his fellow defendants. The trial was not so long, and the evidence against Dworken not so disproportionate, that the jury could not readily discriminate amongst specific charges and defendants.

## VI. CO–DEFENDANT'S GUILTY PLEA

One of the potential buyers, Mitchell Goldberg, pled guilty to the attempt charge, and agreed to cooperate with the government and testify at trial in exchange for certain considerations. Appellants argue (1) that the fact of his plea should not have been elicited during Goldberg's testimony; and (2) that the United States Attorney improperly suggested to the jury that the fact of Goldberg's guilty plea could be used to infer criminal culpability on the part of the defendants.

Some background is necessary to understand appellants' complaints. During his opening statement, the prosecuting attorney stated:

> Mr. Goldberg has entered a guilty plea in this Court to the charge of attempted possession with intent to distribute more than 50 kilograms of marijuana. He entered a guilty plea to that count of this indictment that involved him. *He was like all of the other co-defendants in this case* except for Mr. Dworken. Mr. Dworken is a broker, all the other defendants are buyers, allegedly.

Defense counsel understandably took umbrage at the underscored comment, and asked for an admonition and assurance that the government would go "no further along this line." The court responded that "I'm sure we can trust the government," and instructed the jury as follows:

> [The prosecutor] misspoke himself in referring to an individual, Mitchell Goldberg, who has, as he has indicated, pleaded guilty to the offense of the attempt charged against him in the indictment, that plea. The fact that he has pled guilty is pertinent only to the question of his guilt, and it may not be taken by you to be any indication whatever of the guilt of any other defendant charged in this indictment.

So that, to the extent that what [the prosecutor] said when he misspoke himself, that these other defendants are like Mr. Goldberg, that is not true; he concedes that is not true, that [it] is ultimately for you to determine whether or not on all of the evidence the government

has proven beyond a reasonable doubt that these defendants have committed any offense charged in this indictment. You won't rely in any way upon the fact of Mr. Goldberg's having pleaded guilty himself as being evidence of guilt as to anyone.

There was no objection to this limiting instruction.

Right before Goldberg was to testify, defendants moved to preclude the government from eliciting the fact of Goldberg's guilty plea. The court denied the motion, reasoning that the plea and its terms were material to the issue of witness credibility.[21] The government was allowed to present evidence of the plea agreement as an anticipatory buffer, i.e., to defuse an anticipated line of cross-examination by revealing in advance that Goldberg was to receive advantages as the result of his testimony. The court instructed the jury that witness credibility was the only purpose for which this information could be used.

Goldberg testified about Dworken's attempts to bring him into the Maine scheme; Goldberg was brought up to Portland and shown an unacceptable sample of marijuana. He never met Cunniff and never placed an order. Over defense objection, Goldberg testified that he "intended" to possess the marijuana he was offered "if I could work out a deal."

During the government's rebuttal summation, counsel explained to the jury that the fact that Goldberg left Maine without agreeing to a purchase "didn't change the fact that [Goldberg] committed a crime." He added that "to the extent that [Goldberg] told you what his intent was, that would aid you in determining what the intent of these other defendants was." Defendants' objection to these comments was

overruled. The court, in its charge, twice instructed the jury that the fact and details of Goldberg's plea agreement could be used only on the issue of his credibility, and not as evidence of the defendants' guilt. Appellants challenge the prosecution's repeated references to Goldberg's plea, and the insinuation that Goldberg's intent was probative of their intent.

■ We note first that the fact of the guilty plea and the plea agreement properly may be elicited to dampen the effect of an anticipated attack on the witness's credibility. *United States v. Louis*, 814 F.2d 852, 856 (2d Cir.1987); *United States v. Baez*, 703 F.2d 453, 455 (10th Cir.1983); *United States v. Fleetwood*, 528 F.2d 528, 532 & n. 8 (5th Cir.1976). In such a case, "[b]ecause of the potential for prejudice, cautionary instructions limiting the jury's use of the guilty plea to permissible purposes are critical." *Baez*, 703 F.2d at 455. In the present case, such instructions were provided during the government's opening, at the time Goldberg testified, and in the final jury instructions. Therefore, it was not error for the court to allow the government to reveal that Goldberg had pled guilty to the indictment in a deal with the government.

A much more difficult question is presented by the prosecution's comments on the implication of that plea. "[A] defendant is entitled to have the question of his guilt determined upon the evidence against him, not on whether a codefendant or government witness has been convicted of the same charge." *United States v. Miranda*, 593 F.2d 590, 594 (5th Cir.1979) (footnote omitted). *See also Louis*, 814 F.2d at 856. Hence, it is "impermissible ... to emphasize ... the guilty pleas of

21. Defense counsel had tentatively provided assurance that "we do not intend to attack [Goldberg's] credibility." The court, however, reasonably figured that "[h]is credibility is going to be in issue in any event, whether [or not] an overt attack is made in cross-examination." Rather than refuting this logic, defense counsel had acknowledged that "[i]f it turns out, in the course of cross-examination, that defense or a defendant attacks [Goldberg]'s credibility, we might have a different posture."

By the same token, defendant's argument would be in a different posture had defense counsel stipulated with certainty that Goldberg's credibility would not be challenged. In that case, the guilty plea and the terms of the agreement struck with the government would not have been probative as to any part of Goldberg's testimony or the crimes alleged.

witnesses as substantive evidence of the guilt of a defendant charged with similar crimes." *Id.* Such emphasis is but another all-too-common example of the phenomenon that "too often in strong cases prosecutors make statements they need not make." *United States v. Dougherty*, 810 F.2d 763, 767 (8th Cir.1987). In several cases, convictions have been reversed for plain error in response to such zealous overkill. *See, e.g., United States v. Austin*, 786 F.2d 986 (10th Cir.1986); *Fleetwood*, 528 F.2d 528; *see also Miranda*, 593 F.2d at 594 (stating plain error rule); *cf. Dougherty* (harmless error analysis sustains conviction). The government's first mistake, in its opening statement, was in following the information of Goldberg's plea with the comment "He was like all of the other co-defendants in this case except for Mr. Dworken." One obviously reasonable interpretation of this juxtaposition was that because Goldberg was guilty, the defendants must be guilty for engaging in the same acts. It strongly suggests a logical variant of guilt by association. Fortunately, it immediately was remedied by the court's limiting instruction, to which there was no objection.

The statements are more troublesome for what they suggest about the probative value of Goldberg's intent. Goldberg testified that he intended, provisionally, to purchase marijuana. The government, in rebuttal summation, told the jury that this revelation "would aid you in determining what the intent of these other defendants was." As to the conspiracy charge, this might in some sense be true—the intent of one co-conspirator can be material in deciding the intent of another, at least as to the objective of the conspiracy. But it is not at all probative on the issue of the intent element of the attempt charge; Goldberg's intent does not in any way indicate another defendant's intent.

The prosecution's statements rise to the level of misconduct because the principal issue on the attempt charge was whether criminal intent could be inferred from the actions of the defendants. Immediately preceding its claim that Goldberg's intent was relevant in determining the others' intent, the prosecution stated that Goldberg's refusal to commit to the transaction proposed by Dworken "didn't change the fact that [Goldberg] committed a crime." The obvious logical inference is as follows: (1) Goldberg's actions provided the requisite criminal intent for attempted possession, and he even admitted as much in his testimony and through his guilty plea; (2) the other defendants performed the same or greater actions during the same scheme; therefore: (3) the other defendants had the requisite intent, and thus are at least as guilty as Goldberg.

This inference is plainly improper. The prosecution, in fact, erred simply in telling the jury that Goldberg's withdrawal from the scheme did not negate guilt. The implication was: if Goldberg is guilty for what he's done, surely those who have done more must be guilty as well.

"To require a new trial, we must conclude either that, despite the instruction, the misconduct was likely to have affected the trial's outcome, or that sanction is needed to deter future prosecutorial misconduct." *United States v. Capone*, 683 F.2d 582, 585–86 (1st Cir.1982) (citations omitted). We are convinced that this prosecutorial misconduct did not so prejudicially affect the defendants' rights as to deprive them of a fair trial. *See Dougherty*, 810 F.2d at 767. First, we assume that the jury heeded the court's repeated insistence that the guilty plea not be used to infer the guilt of those on trial. Even in light of the court's refusal to strike the prosecutor's remarks in rebuttal summation, the constant reiteration of the limiting instruction provided sufficient guarantee that the government's underhanded tactic would be unavailing. Second, the jury did not convict Toscano, despite the fact that he took far more substantial steps than Goldberg to consummate the transaction (e.g., specific negotiations with Cunniff). This demonstrates that the jury did not presume intent (and therefore guilt) of all those whose actions were more extensive and unequivocal than Goldberg's. Finally, the evidence against the defendants on the attempt charge was overwhelming, as explained in

Section III, *supra.* Even if the jury *had* considered Goldberg's guilty plea, whatever slight support for conviction might have been provided by the government's inferential suggestions was but a drop in the ocean relative to the extensive probative evidence elicited from the tapes and from the testimony of Agent Cunniff.

We also do not think that the prophylactic of a new trial is necessary as a deterrent to future misconduct. We assume that the government will henceforth heed our admonitions against improper use of a guilty plea. We should not have to remind the United States Attorney that he is the representative

> not of an ordinary party to a controversy, but of a sovereignty whose obligation is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.... It is as much his duty to refrain from improper methods calculated to produce a conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). *See also United States v. Kattar*, 840 F.2d 118, 127–28 (1st Cir.1988) (criminal trial should be viewed not as an adversarial sporting contest, but as a quest for truth).

## VII. PRESENTATION OF A FULL DEFENSE CASE

The final argument is raised by Dworken alone.[22] He claims that he was denied the opportunity to present his defense case. In particular, the court refused to allow him to play for the jury one six-minute audiotape of a telephone conversation between Dworken and Cunniff on March 7, 1986. Dworken claimed at trial that the voice inflections on that tape would show that he withdrew from the alleged conspiracy, and that his intent to remain involved in the scheme was at best equivocal.

The trial judge refused to allow Dworken to play the tape. To understand why, it is necessary to back up a bit. After the first long tape had been played in part, *see supra* at 27, the government moved to skip certain immaterial parts of the remainder of it. The defense would not assent to this method, instead insisting that the tape be played in its entirety in order to provide complete context for the conversations therein. Virtually all of that tape was played for the jury. Because of the time-consuming nature of this procedure, the judge soon thereafter decided that the audiotapes would not be directly used during the rest of the government's case. Instead, Agent Cunniff was asked to testify as to the essential contents of his conversations with the defendants, making reference to the tape transcripts to assist his recollection. The defense was allowed to cross-examine Cunniff to challenge his interpretations of the meetings. If his testimony was seriously impeached, the tapes could be used to rehabilitate the witness. The defendants agreed with this procedure. The government objected because, it argued, voice and demeanor were critical. The court denied the government's motion to play the entire tapes. The alternative procedure, Cunniff's testimonial summarization, was used for the remaining audiotapes. No one mentioned to the judge that the defense itself might wish to play an audiotape.

■■ The tape in question recorded a conversation between Cunniff and Dworken on March 7th, after Dworken had returned to New York. Dworken's buyers evidently had become suspicious of Cunniff, and Dworken was calling to say that he couldn't bring the money up to Maine that day. He was wary of being "entrapped," and expressed concern that Cunniff might be a law enforcement official. Though Dworken insisted that the doubts were only those of the buyers, it can be inferred that he too was suspicious. He was, as he claims on appeal, subdued and hesitant, even contrite, in this conversation. He proposed that Cunniff ship a large portion of the marijuana to New York as a

---

22. Although Rogove and Gay purport to adopt and incorporate all of Dworken's arguments, this point cannot in any way be said to concern their convictions.

good faith gesture. Cunniff became angered that Dworken was backing out of the deal or playing "bait and switch." He refused to send the drugs without a downpayment being delivered in Maine. Dworken declined these terms, and it seemed that the deal had fallen through. (Later that day, Rogove and Dworken again called Cunniff to try to iron out their differences.)

On direct, Cunniff testified as to the content of the conversation. Dworken's counsel, on cross-examination, had Cunniff emphasize those portions of the tape where Dworken expressed doubt about going ahead with the deal and where Dworken flatly refused to continue on Cunniff's terms. Counsel had Cunniff confirm that the reason for Dworken's fear was suspicion that Cunniff was a law enforcement official. Cunniff's testimony accurately reflected the content of the conversation—at no point did he in any way distort what had occurred. Cunniff was not asked, on direct or cross, about voice inflection or demeanor, though counsel was free to so inquire.

Nonetheless, Dworken insisted after direct testimony that the jury hear the tape, so that it could discern Dworken's demeanor. The court denied this request for the following reasons. Dworken had consented to the court's decision to exclude all audiotapes. He had not mentioned his desire to play this one. Had he done so, the court initially might have taken a different approach to the tapes because it might have agreed with the government that one tape should not be played without the context of all the others. The court refused Dworken's request, reasoning that it would then have to allow the government to show more culpable demeanor on all of the other tapes. This would defeat the trial strategy that the court had fashioned with the assent of the defendants. At this point, Dworken's counsel agreed to go along with the idea of playing all the tapes if that was the only way to have his desired tape played. Counsel claimed that he had not mentioned this compromise posture before because "I was bowing to my brother defense counsel with regard to *their* position [to refrain from playing any audiotapes]."

With due respect to counsel, the defendant's original consent to the exclusion of all audiotapes estopped him from making any subsequent objection.[23] The court was well within its discretion in sticking with its theretofore successful trial management strategy. It even provided Dworken the opportunity to question Cunniff on cross concerning Dworken's demeanor, and the option of recalling Cunniff on the defendant's direct case for the same purpose. Dworken did not take advantage of either option.[24] What he did do instead was to focus Cunniff's cross-examination on those portions of the conversation that best manifested Dworken's attempt to "withdraw" from the scheme. He did a fine job, in fact, of obscuring most of the context of the conversation, and making it sound as if Dworken had simply and *un*conditionally withdrawn. The playing of the tape would have only undermined Dworken's effective cross-examination of Cunniff.

Finally, the tape simply does not negate culpable intent—on the contrary, it makes it crystal clear that Dworken was still willing to go ahead with the deal if

---

**23.** In fairness to counsel, it can be inferred from the transcript that counsel believed the court's ruling to apply only to the government's direct case, and not to the defense case. The court acknowledged that it had not even considered the possibility of the tapes being used by the defense, because no one had mentioned the possibility. We do not think it unreasonable to conclude that counsel should have anticipated the evident problem that was to arise from their desire to play one tape in isolation.

**24.** We make no comment about whether it would be within the court's discretion to deny the playing of allegedly exculpatory tapes if the defendant had originally objected to such a de-

nial and if there was no other way to elicit the desired evidence. For instance, this would be a much harder issue had defense counsel wished on cross-examination to use the tape directly to impeach Cunniff's testimonial recollection about inflection and demeanor. In that case, it would be hard to see how the court could foreclose Dworken from using the tape for impeachment purposes. But Dworken never challenged Cunniff's version. Instead, he merely complained, *before* cross-examination, that Cunniff's testimony was "selective." If that were so, Dworken should have revealed the nature of the selectivity on cross-examination.

Cunniff would consent to his terms. The "abandonment" that was revealed on the tape was neither voluntary nor complete, as those terms are defined in the Model Penal Code. Dworken was to withdraw only because of fear of apprehension, not because of a change of heart. And that withdrawal was contingent, not absolute; Dworken was willing to postpone the criminal conduct until he could reach more acceptable terms. Thus, even if there had been error in excluding the tape, it would have been harmless—the tape corroborates Dworken's criminal intent.

## VIII. CONCLUSION

Having found no reversible error on the attempted possession counts for each defendant, those convictions must be affirmed. It follows that the convictions of Rogove and Dworken for use of communication facilities in violation of the narcotics laws should also be upheld. Dworken apparently does not appeal his conviction on the possession count.

*Affirmed.*