UNITED STATES of America, Appellee,

v.

George Kaithovalappil LOUIS, Defendant-Appellant.

No. 70, Docket 86–1210.

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1986.

Decided March 11, 1987.

David Eames, New York City (Kotite Kaplan Bodian & Eames, New York City, of counsel) for defendant-appellant.

Michael Bromwich, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. for S.D.N.Y., Warren Neil Eggleston, Asst. U.S. Atty., New York City, of counsel) for appellee.

Before OAKES, MINER and MAHONEY, Circuit Judges.

MINER, Circuit Judge:

George Kaithovalappil Louis appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York (Duffy, J.) following a jury trial. Louis was convicted of conspiracy to import heroin, 21 U.S.C. §§ 846, 963 (Count One); importing heroin, 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(A) and 18 U.S.C. § 2 (Count Two); and attempting to distribute heroin, 21 U.S.C. § 846 and 18 U.S.C. § 2 (Count Three). Louis contends that the trial court erroneously admitted into evidence a co-conspirator's conviction and two tape-recorded conversations, that he was not brought to trial within the time required by the Speedy Trial Act, and that he was improperly sentenced under standards applicable to those convicted of drug trafficking in Hong Kong.

## I. BACKGROUND

The events giving rise to the conviction and sentence subject of this appeal had their genesis in Hong Kong in late 1984, when defendant-appellant Louis struck up a friendship there with one Nuri Lama. The two men developed a close relationship and, when Louis indicated a need for money, Nuri Lama made him the following proposition: "If you are interested, then you have to get me some people for me to smuggle drugs for me in the United States." Transcript at 95. Nuri Lama described the drugs as "illegal medicine," and his proposition included the *caveat*, "if you get caught you might go to jail."

Louis, a citizen of India, thereafter attempted to recruit couriers for the enterprise by posting a notice on the bulletin board in the lobby of the Hong Kong hotel in which he was living. The notice offered a round trip to New York to anyone having a valid United States visa. Garden Lawson, a Canadian national on a business trip to the Orient, responded to the invitation in March of 1985. Louis told him that he would be paid for smuggling "cancer medicine," which had not been approved by the U.S. Food and Drug Administration, to New York. Reassured that no narcotics would be involved, Lawson agreed to make the trip.

At a meeting on March 27, 1985, at his hotel, Louis gave Lawson four closed cannisters containing almost six and one-half ounces of heroin together with several condoms he had received from Nuri Lama. In accordance with Lama's instructions, Louis directed Lawson to place the cannisters in the condoms and insert them in his rectum. Stepping into a nearby bathroom, Lawson ignored the direction, placed the cannisters inside his underwear and then proceeded with Louis to the Hong Kong airport. At the airport, they were met by Nuri Lama, who gave Louis some cash and an airline ticket for delivery to Lawson. After he received these items, Lawson boarded an airplane, bound for New York City, where he was to check into a hotel and await further instructions.

When Lawson left the airplane during a stopover in Seattle, Washington on March 27, 1985, he was detained by a Customs Inspector, whose suspicions led to the search of his person and the inevitable seizure of the heroin he was carrying. Following his arrest, Lawson revealed the details of the smuggling scheme to agents of the Drug Enforcement Administration ("DEA") and agreed to make a controlled delivery of the heroin in New York City.

Upon his arrival in New York on March 28 in the custody of the DEA, Lawson called Hong Kong as directed and left a message for Louis that he soon would be checking into one of the hotels named in a list Louis had given him. After he arrived at the hotel, Lawson received a call from Louis, who told him that he would be contacted shortly. Later that evening, he was called by Milan Lama, who subsequently came to the hotel at the request of Nuri Lama to pick up the heroin. The encounter between Lawson and Milan Lama at the hotel was monitored and recorded by DEA agents, who arrested Milan after he accepted the heroin package and paid the $1,500 balance due Lawson for smuggling services rendered.

Milan Lama and Garden Lawson were convicted after a jury trial in late May and early June of 1985 before Judge Weinfeld in the Southern District of New York. Nuri Lama entered the United States in June 1985 and was arrested on a charge arising from an unrelated heroin transaction. His plea of guilty in the Northern District of Iowa was accepted in satisfaction of all pending charges, including those arising from the courier scheme in which Louis was involved. Louis was arrested in Hong Kong on an extradition warrant, waived extradition and arrived in New York on September 7, 1985. He entered a plea of not guilty on September 9, 1985.

Apparently dissatisfied with his then-assigned counsel, Louis forwarded a *pro se* motion for the substitution of counsel to Magistrate Buchwald on October 18, 1985. Although Louis certified that he had sent copies of the motion to his counsel and to the United States Attorney's office, the copies were not received by the addressees. The original motion papers were not received in Judge Duffy's chambers until November 19, 1985, and the government did not learn of the motion until advised by the Judge's chambers in mid-January. A hearing on the issue of new counsel was held on January 23, 1986, and the court thereafter excluded from Speedy Trial Act time requirements the entire period commencing with the filing of the motion.

The trial began on March 25, 1986 and concluded on April 1, 1986, with a verdict of guilty on all three counts. The government's witnesses were Athal Williams, a United States Customs Inspector at the Seattle airport; Arthur Hubbard, a DEA agent; Nuri Lama; and Garden Lawson. Lawson testified on direct examination that he had been tried, convicted and sentenced to a three-year term for the same offenses with which Louis was charged. Louis rested without calling any witnesses or offering any evidence. The government then introduced two tape recordings of telephone calls from Louis to Thomas Sage, a heroin dealer. Nuri Lama identified the voices on the recordings and testified that the calls were placed at his request to determine whether Sage desired to purchase heroin, referred to as "carpets" in the telephone conversations.

Prior to imposing sentence, the trial judge undertook an extended discussion of his social meeting with a judge of the High Court of Hong Kong. He explained that the Hong Kong judge had given him a "feel" for the kinds of sentences imposed for drug trafficking in Hong Kong and had advised him that the minimum sentence there for "anything over a minor amount" is twenty years. The trial judge observed that the information he received during the social meeting made it "obvious" to him why Louis had waived extradition.

## II. DISCUSSION

### A. *The Evidentiary Challenges*

Lawson testified on direct examination that he was tried, convicted and sentenced for the same offenses for which Louis was on trial. Louis argues that this testimony enabled the jury to infer that his defense of lack of knowledge of the nature of the contraband was rejected by another jury. Relying on *United States v. Miranda*, 593 F.2d 590 (5th Cir.1979), and *United States v. Fleetwood*, 528 F.2d 528 (5th Cir.1976),

Louis contends that it was improper and prejudicial to place evidence of the conviction of his co-conspirator before the jury.

■ While it is impermissible for a prosecutor to suggest to a jury that the conviction of a testifying co-conspirator is evidence that a defendant on trial is guilty, *Miranda,* 593 F.2d at 593–94, or to emphasize, through repetitive and cumulative questioning, the guilty pleas of witnesses as substantive evidence of the guilt of a defendant charged with similar crimes, *Fleetwood,* 528 F.2d at 533–35, it is acceptable for the government to elicit, for proper purposes and in a proper manner, an accomplice witness' testimony regarding his conviction, *United States v. Aronson,* 319 F.2d 48, 51–52 (2d Cir.), *cert. denied,* 375 U.S. 920, 84 S.Ct. 264, 11 L.Ed.2d 164 (1963). Proper purposes include disclosure of matters damaging to the credibility of a witness and contradiction of any inference that the government is concealing a witness' bias. *United States v. Borello,* 766 F.2d 46, 57 (2d Cir.1985); *United States v. Edwards,* 631 F.2d 1049, 1051 (2d Cir.1980); *United States v. Singh,* 628 F.2d 758, 761 (2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980).

■ The testimony of Garden Lawson regarding his conviction and sentence was elicited in a proper manner and for proper purposes. It was given in response to four brief questions and permitted the jury to make an informed assessment of the witness' credibility. It also served to apprise the jury of derogatory information in the possession of the government. With regard to the claim that the jury could infer that the defense of lack of knowledge was rejected previously, it is sufficient to note that Lawson's testimony included no mention of that defense.

Louis' challenge to the admissibility of his two tape-recorded conversations with Sage concerning the sale of heroin ("carpets") rests on the grounds that the tapes were: (1) improperly authenticated; (2) erroneously admitted as similar act evidence;

and, (3) the subject of misleading instructions by the court.

■ The tapes were properly authenticated by Lama, who identified the voices of both Louis and Sage. Fed.R.Evid. 901(a). In the absence of any other specific challenge, *see United States v. Fuentes,* 563 F.2d 527, 535 (2d Cir.1977), this evidence of authentication was sufficient. Although Louis concedes that similar act evidence would be admissible in light of his defense of lack of knowledge, Fed.R.Evid. 404(b), he contends that the tape recordings of his conversations with Thomas Sage do not constitute such evidence. This contention is predicated upon his assertion that the "carpets" offered for sale were not known to Louis to be heroin. Indeed, Nuri Lama testified only that he asked Louis to place the telephone call to offer "carpets" for sale to Mr. Sage. He admitted, however, that he used "carpets" as a code name for heroin. Louis obviously knew that Nuri Lama was not in the carpet business, and it is significant that he expressed concern that Sage speak to him over a secure telephone line. The inference is inescapable that Louis was offering Sage drugs on behalf of Lama. This inference is bolstered by the jurors' conclusion that Louis imported drugs into the United States on behalf of Lama, a conclusion they were required to reach before turning to the similar act evidence. Transcript at 372. Finally, the judge's standard charge regarding similar act proof clearly was adequate, and Louis waived any challenge to it by failing to object to the charge when given. *United States v. Sun Myung Moon,* 718 F.2d 1210, 1226 (2d Cir.1983), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984).

## B. *The Speedy Trial Act*

Louis' contention that he was not brought to trial within the time mandated by the Speedy Trial Act, 18 U.S.C. § 3161 *et. seq.,* is predicated upon his claim that the district court improperly excluded from the time requirements the entire period that elapsed between the time he filed the

motion for substitution of counsel with Magistrate Buchwald—October 18, 1985—and the time of the hearing on the motion—January 23, 1986. Other than his challenge to this exclusion, Louis apparently concedes that he was brought to trial in a timely fashion.

Although the Speedy Trial Act requires that a defendant be tried within seventy days of the filing of an indictment or of a defendant's first appearance in court, 18 U.S.C. § 3161(c), various exclusions from the seventy-day calculation are permitted. Among these are periods of "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F). Louis asserts that his "effort" to substitute counsel was not a motion because of irregularities in the service and filing of the papers. He contends that, since the papers were improperly filed with the Magistrate and not received by the government, there is no basis upon which to determine that there was a pending motion in the Speedy Trial Act sense.

■ The district court's determination that a motion was pending has ample support in the record. A motion can be "filed" with a judge, Fed.R.Civ.P. 5(e), and even an oral motion is sufficient to invoke the time exclusion provided by the Speedy Trial Act. *United States v. Nixon,* 779 F.2d 126, 130–31 (2d Cir.1985); *United States v. Cobb,* 697 F.2d 38, 43 (2d Cir.1982). Despite the informality of the motion and Louis' failure to serve it on the government, the district court entertained the application and gave Louis the benefit of a hearing. In point of fact, the motion was successful; new counsel entered the case on behalf of Louis, filed pretrial motions to dismiss and conducted the trial. All delay between the filing of the motion to substitute counsel and the conclusion of the hearing on that motion properly was excluded from the Speedy Trial Act's seventy-day limitation. *Henderson v. United States,* — U.S. —, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986).

C. *Improper Considerations in Sentencing*

■ The following extensive quotation is taken from the sentencing minutes:

THE COURT: Call it chance, or whatever you want to call it, about three weeks ago I had a phone call from some folks I had not seen in 13 or 14 years. They invited me to their home because they were having as a houseguest a judge from overseas. It turned out to be a judge from the High Court in Hong Kong. I discussed this case with him without knowing, George Louis, that you had been arrested in Hong Kong for distribution, or, how do they phrase it, trafficking in a dangerous drug, and that you had waived extradition to this country so as to avoid prosecution for the Hong Kong offense. I didn't know that. In fact, I didn't know that until the pre-sentence report was given to me two or three days ago.

In connection with the discussion of your case with this Hong Kong judge—I never mentioned your name or the exact facts of the case—all I wanted to do was get a "feel" as to what kind of sentences the Hong Kong courts were handing out for trafficking in dangerous drugs—the judge was good enough in giving me that "feel." He stated to me that, unlike other crimes where the sentence is directed at the criminal, in Hong Kong trafficking in drugs is directed at the crime, and for a first offense, for a minor amount of narcotics, the defendant will get three years; for a first offense there, for anything over a minor amount, such as the amount involved in this case, a defendant will get a minimum of 20 years.

The reason that you waived extradition is pretty obvious, became obvious to me at that point. I asked why and he told me why. The authorities in Hong Kong recognize that there is a certain amount of shipment worldwide of narcotic drugs from Hong Kong. They consider it to be a nefarious business. They are right, it is. It is the heroin that comes from Hong Kong that ends up in some junkie's veins here in the streets of New York. Right now some young man or woman is

dying right here in the City of New York, dying from heroin that came from the same source as the heroin in this case.

Unlike the Hong Kong authorities, who just think it is a nefarious business, here the impact of heroin smuggling from Hong Kong is far greater and has to be treated more severely than situations where people who might be junkies are dealing in small amounts. You were dealing in a major amount of narcotics; you were actually facilitating the pipeline of heroin into this country and you were doing it for one thing—greed.

Sentencing Hearing Transcript at 6–8.

Immediately following the above statement, the district court sentenced Louis to a term of imprisonment of twenty years on Count One, twenty years on Count Two and fifteen years on Count Three. The court directed that the sentence imposed on Counts Two and Three run concurrently with the sentence imposed on Count One. In addition, Louis was sentenced to special parole for life on Count Two, to commence upon expiration of the prison sentence. 21 U.S.C. § 960. The maximum sentence on each count was imprisonment for twenty years. Garden Lawson and Milan Lama had been sentenced to prison terms of three years and five years respectively.

It has long been established that an appellate court has no control over a sentence that is within the limits imposed by statute, unless the sentence is informed by improper or inaccurate information. *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974); *United States v. Harris,* 558 F.2d 366 (7th Cir.1977). Although the sentence imposed by the district court judge was within statutory bounds, Louis had no opportunity to challenge the accuracy of the information furnished to the district judge by an unknown judicial officer from Hong Kong. Aside from the fact that the district judge appeared to rely almost entirely on sentencing standards established in a different jurisdiction, there was no opportunity for the defendant to determine whether those standards applied to him or whether they existed at all. "Ex parte conversations or correspondence with experts, law teachers or otherwise, is unfair and can be misleading. The facts given may be incomplete or inaccurate, the problem can be incorrectly stated or other matters can be incorrectly stated." Denecke, *The Judiciary Needs Your Help, Teachers,* 22 J. Legal Educ. 197, 203 (1969), *quoted in Matter of Fuchsberg,* 426 N.Y. S.2d 639, 648 (N.Y.Ct.Jud.1978). While consulting an outside expert regarding matters *sub judice* is not entirely prohibited, "[t]he interests of all parties are protected if, in each case where an expert is consulted, the parties are informed of his identity, the substance of his advice and allowed an opportunity to respond. Failure to observe such safeguards creates the possibility of unfairness." *Matter of Fuchsberg,* 426 N.Y.S.2d at 648. This, in fact, is the rationale behind Fed.R.Crim.P. 32(c)(3) relating to disclosure of information in presentence reports and the right to challenge inaccuracies contained therein. Fed.R. Crim.P. 32(c)(3)(D).

In view of the foregoing and of all the circumstances, we deem it best that the matter be remanded for sentencing before another judge.

## CONCLUSION

We affirm Louis' conviction, vacate his sentence on all counts and remand the matter for resentencing before another district judge.