**The UNITED STATES**

v.

**Harry David TYLER, Gloria Watkins.**

**Appeal of Harry David TYLER.**

No. 88–3498.

United States Court of Appeals,
Third Circuit.

Argued Nov. 29, 1988.

Decided June 30, 1989.

J. Alan Johnson, U.S. Atty., Bonnie R. Schlueter (argued), Asst. U.S. Atty., Pittsburgh, Pa., for appellee.

George E. Schumacher, Federal Public Defender, Thomas S. White (argued), Asst. Federal Public Defender, Pittsburgh, Pa., for appellant.

Before SEITZ,* STAPLETON and COWEN, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

In this appeal from a criminal conviction, the defendant raises several issues for review, the principal one being whether the government's filing of a petition for writ of mandamus tolls the running of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, until adjudication of the action by the court of appeals. The district court held that the time taken to process the petition is excludable for purposes of the Speedy Trial Act. We will affirm the judgment of the district court on this issue as well as on the other issues raised by the defendant.

### I.

On Saturday, May 9, 1987, a lone male entered the Shadyside branch of the post office in Pittsburgh, near closing at approximately noon, and robbed two postal clerks on duty that day. The robber carried a revolver and demanded that clerks Gloria Watkins and Paul Frankovich give him all their cash and stamps. The robber stuffed the money and stamps into a brown paper bag, ordered the clerks to take off their pants and lie down for twenty minutes, and then left by the front door onto a street crowded with pedestrians.

The postal employees reported the robbery to the authorities, and described the robber to a Pittsburgh police officer as "a black male, approximately 5–10 to six foot, 200 pounds, black hair, close cropped ...

---

* Since the date of argument of this case Judge Seitz has taken senior status.

he had a cap, the color was blue, the style was t[assel]. He had a blue full length coat and full overalls." App. at 326.

Unknown to either clerk, the postal inspectors had previously installed a hidden video camera in order to observe Gloria Watkins who, because she had a history of shortages of cash and stamps totalling $5,400 for the period of May of 1986 through May of 1987, the authorities suspected of embezzlement. Although the video camera did not take pictures with the clarity of a surveillance camera, it nevertheless captured the entire robbery, which lasted less than two minutes, on film.

After viewing the video, the postal authorities decided to focus their investigation on Gloria Watkins because they believed that certain actions by Watkins and the offender during the robbery suggested that it may have been an "inside job." Moreover, the postal inspector in charge of the case was suspicious because of the robber's demand for stamps as well as cash; it was the first time the inspector had heard of such a request for stamps in his nineteen years of investigating postal robberies. The postal inspector ordered an immediate surveillance on the home of Gloria Watkins, and during that surveillance noticed a black male living at Watkins' house who fit the general description of the robber.

A photograph of this black male was obtained and included in a photospread of eight black, bearded males, which was then shown to two eyewitnesses, postal patron Diana Thompson and postal clerk Frankovich. Ms. Thompson, who had noticed a black male in the post office just before noon and who saw the same man later leaving the post office with a brown paper bag, described the man at trial as wearing "some sort of blue pants, jeans or slacks, a blue, navy blue jacket, a zipper kind of jacket and a blue baseball type of cap." App. at 339–340. She was, however, unable to make a positive identification of the robber from the photospread. When the photospread was shown to postal clerk Frankovich, he picked as the robber the photograph of the man who had been spotted at Watkins' residence; the man in the picture was identified as defendant Harry David Tyler.

On the basis of this evidence, search and arrest warrants were executed at Watkins' house. Although the search yielded no large amounts of money or stamps, the postal inspectors did find a rusty-barrel revolver, a navy blue tassel cap, and a light blue baseball cap with white markings. Shortly after his arrest, Tyler signed a written statement in which he said, "[T]he only time I was ever in [the Shadyside] post office was about a year ago when I took Gloria a sandwich for lunch." App. at 439.

The government moved for an order that Tyler participate in a line-up. Tyler then moved for a so-called "blank lineup," one that did not include the accused, to be followed by a regular lineup. The government later withdrew its request for a lineup, but the district court nevertheless granted Tyler the right to conduct the blank as well as the regular lineup, and additionally authorized the subpoenaing of "persons who look like Tyler" to appear in the blank lineup. In an effort to stop the blank lineup, the government filed with the district court, first, a Motion to Reconsider and second, a Motion to Stay the Order, which were each in turn denied. The government then sought a stay from this court which was also denied. Subsequently, on July 7, 1987, the government filed a Petition for Writ of Mandamus with this court; we denied the motion as moot on November 19, 1987, because the blank lineup had proceeded during the pendency of the motion.

The blank line-up produced the following results, which were testified to at trial. Frankovich admitted that he selected someone other than the defendant from the blank lineup and that he indicated he was 90% certain that the person was the robber. Frankovich further testified that he chose Tyler from the second lineup and that he indicated he was 100% certain that the defendant was the robber. Diana Thompson picked a man out of the first blank line-up and stated that she was forty percent sure

that this was the man who she saw in the post office. She then selected a second man from the line-up which contained Tyler, other than Tyler, and stated that she was eighty percent certain that this was the man who she saw on the day of the robbery.

On January 4, 1988, the day of trial, Tyler moved for dismissal of the indictment claiming that a violation of the Speedy Trial Act had occurred. The district court denied the motion, reasoning that the time from the government's filing of a petition for a writ of mandamus (*i.e.*, July 7, 1987) to the date when the district court received this court's order denying the motion (*i.e.*, November 23, 1987), was excludable for purposes of the Speedy Trial Act; as such, the court found that a maximum of 67 non-excludable days had elapsed prior to trial, and thus that no Speedy Trial Act violation occurred.

At trial, the government's theory of the case was that Gloria Watkins' was an embezzler and that in order to cover-up this embezzlement, she induced her boyfriend, Harry Tyler, to commit the robbery. As support for its theory, the government introduced an expert who testified that a fingerprint found on a zip code directory at the post office matched the fingerprint of the defendant Tyler; the zip code directory was located in the lobby of the post office where the robber was standing prior to the hold-up. More important, the government established that the directory had only recently been changed approximately seventeen days before the robbery occurred, thus placing Tyler at the post office during that period in direct conflict with his earlier statement to police that he had not been inside the building in over a year. The government also relied on the testimony of postal clerk Frankovich; Frankovich identified Tyler in the courtroom as the person who had robbed him, although on cross examination he admitted that he had selected another person from the blank lineup.

Tyler presented a defense of mistaken identity. A photographic expert, who was a retired F.B.I. agent, testified that the man in the videotape was "most probably not" the defendant. App. at 494–495. A professor of psychology testified that there were "significant questions about the reliability" of Frankovitch's identification of the defendant, app. at 547, due to such factors as the stress and short duration of the incident, the documented difficulties in cross-racial identification, and the suggestiveness of the initial photographic lineup.

A postal employee testified that a black male wearing a navy blue cap, who was not the defendant Tyler, had tried to force his way into the Shadyside Post Office at closing time on Saturday one week prior to the robbery. Moreover, an investigator hired by Tyler testified that several robberies had been committed in the Shadyside community recently in a manner like the post office robbery, by a man who was similar in appearance to the defendant, but who was not the defendant.

Several of Tyler's family members and friends testified that he had been with them at or around the time of the robbery, although on cross examination and through the testimony of the postal inspector, the government elicited that earlier statements by these individuals had been different; at trial the witnesses essentially testified that Tyler had been at his mother's house at approximately 12:10, and then later met friends for drinks at approximately 12:30–1:00, whereas in initial questioning they indicated that Tyler had not arrived to his mother's house until after 1:00.

Finally, another postal employee testified, in contrast to Tyler's earlier statement to the police, that Tyler had been in the post office several times in the last year, although the government again elicited on cross examination that these visits may not have been since the new zip code directories were placed in the building.

On January 12, 1988, the jury found Tyler guilty on three counts of the indictment charging him with offenses related to the postal robbery, and on July 13, 1988, the district court denied Tyler's motion for a new trial. This appeal followed. The defendant asserts three errors at the trial level, specifically, that the Speedy Trial Act was violated, that the district court improp-

erly admitted a key piece of evidence, and that the district court erroneously denied the defense's motion for mistrial based on prosecutorial misconduct. The first issue presents a question of law which is subject to plenary review; the second issue, characterized as a relevance challenge, is also subject to plenary review whereas the third issue is reviewable under an abuse of discretion standard.

## II.

■ The primary issue presented in this appeal concerns the alleged Speedy Trial Act violation. Section 3161(c)(1) of the Act provides that "in any case in which a plea of not guilty is entered, the trial of a defendant ... shall commence within seventy days from the filing date (and making public) of the information or indictment ..." 18 U.S.C. § 3161(c)(1). The seventy day requirement is subject to a number of exceptions, however; in particular, with respect to this case, the Act provides in pertinent part:

> (h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:
>
> (1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—
>
> (E) delay resulting from any interlocutory appeal.

18 U.S.C. § 3161(h)(1)(E).

The parties do not dispute the district court's finding that 207 days elapsed from the filing of the indictment to the commencement of trial, nor that 140 days elapsed from the date the government filed the petition for writ of mandamus to the date when the district court received notification of this court's order disposing of the petition. More important, the parties agree that if these 140 days are excludable under the Speedy Trial Act, Tyler's trial was timely. Rather, the issue contested by the parties is whether the time taken to process the petition for writ of mandamus can be properly excluded.[1] The district court below, in dismissing the defendant's motion for a new trial, accepted the government's position that a petition for writ of mandamus is excludable as "another proceeding concerning the defendant," analogous to an interlocutory appeal under 18 U.S.C. 3161(h)(1)(E). We agree.

The district court's interpretation of the Act is consistent with the position taken by both the Court of Appeals for the Second Circuit in its "Guidelines under the Speedy Trial Act" and the Criminal Law Committee of the Administrative Office of the United States Courts in its "Guidelines to the Administration of the Speedy Trial Act of 1974." The Guidelines under which the Court of Appeals for the Second Circuit operates, initially published in January of 1979, provide that extraordinary writs are to be treated as interlocutory appeals for purposes of the Act:

> D. Interlocutory Appeals.
> (Section (h)(1)(D))
> 1. This exclusion applies to appeals taken by the United States under 18 U.S.C. Section 3731, to similar appeals under 18 U.S.C. Section 2518(10)(b), and to appeals taken under 28 U.S.C. Section 1291 and 18 U.S.C. Section 3147(b). *It also applies to applications for extraordinary writs (which can also be excluded under 3161(h)(1), and/or under 3161(h)(8)).*

"Guidelines under the Speedy Trial Act," Judicial Council Speedy Trial Act Coordinating Committee, United States Court of Appeals for the Second Circuit, p. 19 (January 8, 1979) (emphasis added).

The Second Circuit's guidelines were frequently cited with approval during the con-

---

1. The government also argues that even if we were to decide that the mandamus action did not toll the time under the Speedy Trial Act, Tyler's trial was nevertheless timely on the basis of several other § 3161(h)(1) exclusions. After a careful review of the exclusions claimed by the government, we conclude that we must reach the mandamus issue because unless that period of delay is excluded, more than seventy non-excludable days ran from the filing of the indictment in this case.

gressional hearings regarding the amendment of the Speedy Trial Act in 1979. *See* Hearings before the Senate Judiciary Committee on the Speedy Trial Act Amendments, 96th Cong., S. 961 and S. 1028, May 2 and May 9, 1979 (S. 521–45), p. 81, 91, 131, 705. Indeed, these guidelines were reprinted in the *Congressional Record* upon the motion of Senator Biden who chaired the Senate Judiciary Committee's hearings. 125 Cong.Rec. 15475–15467 (June 19, 1979).

The Criminal Law Committee of the Administrative Office of the United States Courts, expressly recognizing the apparent congressional support for the Second Circuit's "relatively expansive" interpretation of the exclusions, adopted its position in December of 1979. The Criminal Law Committee interpreted Section 3161(h)(1)(E) as follows:

### (E) Interlocutory Appeals

*General.* This exclusion applies to appeals taken under the second clause of 18 U.S.C. § 3731 from decisions or orders suppressing or excluding evidence or requiring the return of seized property, and to similar appeals under 18 U.S.C. § 2518(10)(b). Although an application for an extraordinary writ is not, strictly speaking, an "interlocutory appeal," it is an analogous "other proceeding" excludable under paragraph (h)(1).

"Guidelines to the Administration of the Speedy Trial Act of 1974," November 10, 1984.

Relying on a technical interpretation of the Act's language, Tyler argues that the Court of Appeals for the Second Circuit and the Administrative Offices of the United States Courts misinterpreted the Act's provisions. More specifically, he argues that since a mandamus action is a separate *civil* proceeding brought against a *judge*, it

can be considered neither an "interlocutory appeal" in a criminal case nor a proceeding "concerning the [criminal] defendant." We are not persuaded.

Although the nominal defendant in a mandamus action is the district judge, the exceptions enumerated in section 3161(h)(1) are not limited to "other proceedings where the defendant is a party;" rather, the language speaks in terms of delay resulting from "other proceedings *concerning* the defendant." There is no question that the petition for writ of mandamus in this case sought review of the district court's decision to grant Tyler's request for a blank line-up and the subpoenaing of "persons who look like Tyler." Accordingly, Tyler was the real party in interest opposing the mandamus petition and a review of the district court's decision plainly *concerned* the defendant.

More important, we perceive no principled basis upon which to distinguish this kind of interlocutory review with *"any* interlocutory appeal" expressly excluded under section 3161(h)(1)(E). The petition for writ of mandamus sought appellate review of a district court's order concerning a pretrial ruling rendered prior to final judgment. Accordingly, it was the functional equivalent of an interlocutory appeal. We can think of no reason why Congress would have wished the two treated differently for Speedy Trial Act purposes.

The same reasons that support excluding delay resulting from "any interlocutory appeal," also militate in favor of excluding delay resulting from the processing of the petition for writ of mandamus in this case. This court held in *United States v. Felton,* 811 F.2d 190, 198 (3d Cir.1987) (in banc), that "the purpose of [§ 3161(h)(1)(E) ] is to remove from the Speedy Trial Act calculation periods when the district court justifiably cannot try the defendant's case." [2] In

---

**2.** To be sure, in *Felton* we characterized the delay occasioned when the "district court justifiably cannot try" a case as being a period during which "the district court lacks power to proceed ..." 811 F.2d at 198. Nevertheless, section 3161(h)(1)(E) has never been interpreted to apply *only* to interlocutory appeals that deprive the district court of jurisdiction. *See, e.g., Unit-*

*ed States v. Saintil,* 705 F.2d 415, 417 (11th Cir.1983) (holding that a frivolous interlocutory appeal, which presumably would not have divested the district court of jurisdiction to try the case, tolls the running of time under the Speedy Trial Act). At least where, as here, the district court is faced with an interlocutory proceeding in the court of appeals which potentially could

this proceeding, the district court justifiably delayed the trial to await the outcome of the mandamus action because it believed that result potentially could have affected the trial. Specifically, the district court declared when first confronted with the Speedy Trial Act claim at the commencement of trial, that it was inappropriate "to bar prosecution when there is a question of importance pending in the Court of Appeals that theoretically could have affected the trial of this case and [on] which the District Court in good faith waited the guidance of the Court of Appeals." App. at 45.

We agree that under the circumstances presented here the district court justifiably could defer trial until resolution of the appellate proceedings. Since the critical issue at trial would be the question of the robber's identity, the line-up evidence was of central significance to both the government and the defense. Had the government prevailed on the merits of the mandamus petition and had the line-up evidence consequently been suppressed, the trial strategies of the government as well as the defense would surely have been altered.

Although a panel of this court ultimately declared the mandamus petition to be moot, the district court could not have predicted that result with any degree of certainty. Indeed, Judge Aldisert, on the government's direct appeal of the denial of its motion to stay the blank line-up, indicated just the opposite; while denying the stay, he nevertheless opined: "[I] strongly believe, however, that the petition for mandamus should not be considered moot because of the profound public interest in the issue and the reality that the issue is capable of repetition and evading review." Gov.App. at 50–51. We are also not troubled by the fact that the government elected not to seek suppression of the line-up evidence in its petition for writ of mandamus. According to the government, it felt constrained from moving to suppress what was arguably exculpatory evidence. We recognize that the merits panel ultimately found the government's failure to seek this relief im-

portant to the disposition in the mandamus action, reasoning that no live controversy existed because the line-up had proceeded during the pendency of the action and the government was not challenging the admission of the results at trial. Nevertheless, the government opposed the suggestion of mootness and its position was clearly an arguable one.

For these reasons we hold that the 140 days that elapsed between the filing of the mandamus petition and the notification to the district court of the disposition of that petition was "a period of delay resulting from other proceedings concerning the defendant" within the meaning of 18 U.S.C. § 3161(h)(1)(E). It follows that Tyler's trial was timely.

### III.

Tyler raises two additional issues in this appeal. First, he argues that the district court improperly admitted into evidence the blue baseball cap seized in the search of Watkins' house. Second, he urges that the district court erred in denying his motion for a mistrial based on prosecutorial misconduct. We find neither of these arguments persuasive.

### a.

Tyler argues that the baseball cap which had been found in the search of Watkins' home was never properly authenticated at trial and therefore should not have been admitted into evidence. More specifically, he argues that Diana Thompson was the only witness to testify that the robber wore a baseball cap, nevertheless, she never identified the cap that was admitted into evidence as being the one worn by the robber. Moreover, although at trial Ms. Thompson described the cap worn by the robber as being navy blue without any white markings, the cap admitted into evidence was light blue and had large white markings in the front.

affect the trial, we believe the time consumed is excludable for Speedy Trial Act purposes despite

the fact that it may have jurisdiction to proceed.

■ To the extent that Tyler is making an authentication argument, he is in error. The cap was offered into evidence as a cap found at Tyler's residence. It was properly authenticated as being the cap so found through the testimony of Tyrone Garrison, the United States Postal Inspector who conducted the search, at the time when the government moved for the cap's admission at trial. Fed.R.Evid. 901.[3] Thus, we perceive no authentication problem with the introduction of the cap.

■ To the extent that Tyler is making a relevance argument, that is, that the cap was not sufficiently similar to be probative, we also find his position lacking in merit. The district court ruled at trial that the cap found at Watkins' residence was "sufficiently similar to the testimony that we have heard," app. at 447, and allowed its admission on that basis. The district court further reasoned, in response to Tyler's motion for a new trial, that:

> [T]he blue baseball cap was properly admitted as evidence following the witness's testimony that the robber was wearing such a cap, Transcript at 306–308 and 314–315, and the specific shade of blue or the color scheme went to the weight of the evidence.

App. at 892.

Based on Ms. Thompson's testimony, we are not persuaded that the district court erred in finding that the cap offered by the government was sufficiently similar to that the witness described. Ms. Thompson referred to the cap three times as "blue" and only once as "navy blue." App. at 340, 349. Her testimony that the cap did not have white markings was tempered by her admission that she had seen only about three quarters of the cap and had viewed it only from the rear perspective.

Given Ms. Thompson's testimony, we believe the district court was correct in finding that the cap from Tyler's residence was relevant and that the jury should be permitted to decide what if any weight it should be given.

b.

■ The third error alleged by Tyler involves the government's introduction of testimony that Gloria Watkins was in jail. Tyler argues that the government deliberately elicited this testimony during the cross-examination of Tyler's sister in violation of the district court's pretrial ruling that Watkins' convictions, which were for the same crimes that Tyler stood accused, could not be admitted into evidence at Tyler's trial. According to Tyler, by eliciting this highly prejudicial testimony, the government deprived him of a fair trial in violation of the due process clause and the district court should have declared a mistrial.[4]

In support of his position, Tyler relies heavily on our decisions in *United States v. Gullo,* 502 F.2d 759 (3d.Cir.1975), and

---

3. Fed.R.Evid. 901(a) provides in pertinent part: (a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

4. The challenged testimony of Tyler's sister was as follows:

Q: In December of 1987 did—were Harry and Gloria together?
A: No, they weren't.
Q: Why not?
A: Harry was back home with us. He was living with us then.
Q: And did he thereafter resume going back to Gloria's?
A: Yes.
Q: Ma'am, you also stated the last time—I realize this is beyond redirect, Harry Tyler was not staying with Gloria Watkins in December 1987; is that right?
A: December 1987?
Q: Right.
A: Right.
Q: And do you know why he wasn't staying with her don't you?
Mr. White: I object.
Mr. Mead: You asked the question.
Mr. White: This is beyond the scope of redirect.
The Court: Overruled.
Mr. Mead: Do you know why he was not staying with her at that time?
A: Yes, I do.
Q: Why is that?
A: Because she was in jail. But he stayed with us anyway off and on.
App. at 651–652.

*United States v. Newman,* 490 F.2d 139 (3d.Cir.1974). In *Gullo* we held that the defendant did not receive a fair trial where, in the course of asking a question, the prosecution revealed to the jury that the defendant's co-conspirator had pleaded guilty. Similarly, in *Newman* we found reversible error and ordered a new trial because testimony was admitted concerning the conviction of a co-defendant. We reasoned:

> Unquestionably, [the defendant] has a right "to have his guilt or innocence determined by the evidence presented against him, not by what has happened with regard to a criminal prosecution against someone else." [citation omitted]. Thus, guilty pleas and convictions of co-defendants are not admissible to demonstrate the guilt of defendants yet to be convicted.

*Id.* at 143.

We are not persuaded by Tyler's position. The information revealed to the jury in *Gullo* and *Newman* is of an entirely different order than the testimony at issue in the present case. In the prior cases, the jury heard testimony of a co-conspirator's guilty plea and conviction, respectively, thus giving rise to the very substantial risk that the jury in the second case would base its decision solely on the prior determination of guilt and not on the basis of independent consideration. In the present case, however, all the jury heard was that Gloria Watkins was in jail for an unspecified offense. We believe that the danger that the jury would consider such evidence dispositive of Tyler's guilt is remote.

Moreover, in both *Gullo* and *Newman* we expressly recognized that appropriate curative instructions can remedy an error in this context, although in those cases we found the instructions lacking. In *Newman,* we indicated that "... the district court should have instructed that the testimony regarding [the convicted co-defendant] was no proof whatsoever of [the defendant's] guilt and that the testimony proffered should be disregarded completely in determining the guilt or innocence of [the defendant]." *Id.* at 144. Measured

against that standard, we find the curative instructions in this case to be more than adequate.

Immediately after the witness testified that Watkins was in jail, the district court declared to the jury: "That's stricken from the record and it has no significance or probative value." App. at 651. While this represents the district court's only *immediate* curative instruction, it was by no means the court's sole admonition to the jury. In its final charge to the jury, the district court instructed that "any evidence as to which an objection was sustained by the court, and any evidence ordered stricken by the Court must be entirely disregarded by you." App. at 833. More important, the court expressly charged:

> Now, finally, both parties have made reference in this case to the whereabouts of Gloria Watkins in December of 1987. This offense, that is, the robbery, the assault and the theft, took place on May 9, 1987. You are instructed that the whereabouts or residence of Gloria Watkins in December of 1987 had no relevance to or bearing upon the issues in this case. The evidence has no probative value and should be entirely disregarded by you. I caution you, members of the jury, that you are here to determine the guilt or innocence of Harry Tyler from the evidence in this case. Mr. Tyler is not on trial for any act or conduct or offense not alleged in the indictment. Neither are you called upon in this case to decide the guilt or innocence of any other person not on trial, because you are to consider only the charges against Mr. Tyler in this case and consider only the evidence that I have instructed you to consider.

App. at 833–834. Finally, at Tyler's request, the district court further instructed:

> Members of the jury, I neglected to mention two points that had been raised by Mr. Tyler and I intended to give them because they are accurate statements of the law. And they are as follows: You should not convict Harry Tyler merely because he associated with Gloria Wat-

kins. No defendant should be convicted because he keeps bad company.

App. at 838.

Read as a whole, we find that the district court's instructions clearly conveyed to the jury the message that it must disregard the allegedly prejudicial testimony. Moreover, these instructions were artfully crafted so as not to reinforce or add significance to that testimony. Indeed, we are hard-pressed to imagine a set of curative instructions that would, on the one hand, be more effective in communicating that certain statements should be ignored, while on the other hand successfully deemphasizing the testimony's potential for prejudice.

The Supreme Court has consistently reaffirmed the principle that even in criminal cases, the court will "normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the evidence would be devastating to the defendant." *Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1978)(citations omitted). This case does not present the kind of extraordinary situation and inherent risk of prejudice to the defendant that requires us to disregard the presumption that jurors will follow the instructions given to them. Based on our review of the record, we are confident that the instructions in this case fully cured any prosecutorial error below, and that, accordingly, the defendant received a fair trial.

### IV.

For the foregoing reasons, we will affirm the judgment of conviction.

SEITZ, Circuit Judge, concurring.

I join in the majority's decision that appellant's conviction should be affirmed because I agree that the Speedy Trial Act was not violated, that the baseball cap was properly admitted into evidence and that the district court did not abuse its discretion in denying appellant's motion for a mistrial. I write separately because I pre-

fer to rest my conclusion that the Speedy Trial Act was not violated solely on the ground that the delay resulting from the government's petition for a writ of mandamus, albeit filed in the court of appeals, was an "other proceeding concerning the defendant," and thus automatically excluded under the general provision of 18 U.S.C. § 3161(h)(1).