**UNITED STATES of America**

v.

**Louis J. GAEV,**

**Louis Gaev, Appellant.**

No. 93–1643.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) Jan. 19, 1994.

Decided April 29, 1994.

Sur Petition for Rehearing May 26, 1994.

Carl D. Poplar, Poplar & Eastlack, Turnersville, NJ, for appellant.

John J. Powers, III, Andrea Limmer, U.S. Dept. of Justice, Washington, DC, for appellee.

Before: SLOVITER, Chief Judge, SCIRICA and LEWIS, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

Defendant Louis J. Gaev appeals his conviction for conspiring to fix prices in violation of the Sherman Anti–Trust Act, 15 U.S.C. §§ 1–7 (1988). Although Gaev alleges numerous trial errors, we will discuss only one in detail, that the plea agreements of his co-conspirators were improperly admitted into evidence. We will affirm the judgment of conviction and sentence.

### I.

On August 12, 1992, Louis J. Gaev was indicted for conspiring to fix prices of new steel drums offered for sale to customers in the eastern United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] The indictment charged that for a period of at least four years, generally from April, 1986 through March, 1990, Gaev, as Director of National Sales for the Russell–Stanley Corporation, together with co-conspirators, violated the Act by: discussing and agreeing to increase prices on new steel drums to individual customers and to coordinate timing of those price changes; participating in meetings and telephone conversations with co-conspirators to determine prices and terms of sales to individual customers; issuing price quotations in accordance with agreements reached; and concealing conspiratorial contacts through various means, including the use of aliases.

### II.

Steel drums are large steel packing containers used to store or transport chemical and petroleum products. They come in different sizes and gauges, with different types of closures, with or without linings, particular finishes and surface designs or logos. A customer orders by designating a code number for a particular set of specifications, which helps suppliers to quote a price. Most customers prefer multiple suppliers over a single supplier to insure an uninterrupted supply, wider choice and more competitive pricing. Most order prices are negotiated, but some are open to competitive bidding.

Russell–Stanley Corporation ("Russell–Stanley"), Van Leer Containers, Inc. ("Van Leer"), and Mid Atlantic Container Corporation ("Mid Atlantic") were the three major suppliers of new 55 gallon steel drums in the eastern region of the United States between 1986 and 1990. During that time, each company announced price increases on steel drums twice a year. The price increases were announced within a few weeks of each other and all were similar or identical in amount and effective date.

Officers of two of the corporations testified at Gaev's trial that they had participated with him in a price-fixing conspiracy. They were Victor Bergwall, General Manager of Sales for Van Leer, William McEntee, President of Mid Atlantic, and Herbert Stickles, Executive Vice President of Mid Atlantic. Their testimony was corroborated by documentary evidence, including telephone records, expense reports, price announcements, and handwritten memoranda.

Victor Bergwall testified that he was unhappy with the price-cutting that prevailed in the industry in the mid–1980's. In 1986, Bergwall and Herbert Stickles discussed the volatility of the steel drum market and decided it would be better to compete on the basis of quality and service rather than price. The two men began calling each other to verify whether their mutual customers were telling the truth when they claimed to one of them that the other would give a better price on a particular drum. These conversations soon turned to discussions of future prices. Each time a general price increase was announced, Bergwall and Stickles discussed when to put

---

1. The district court had jurisdiction under 15 U.S.C. § 1 and 18 U.S.C. § 3231 (1988). We have jurisdiction under 28 U.S.C. § 1291 (1988).

it into effect and how much of it to implement with specific customers.

Bergwall testified that, early in 1986, he commenced similar discussions with Gaev at Russell–Stanley. Bergwall knew he should not be talking to competitors about pricing, but he wanted to "stabilize the market" and believed that Russell–Stanley, who was the largest supplier, had to be part of the agreement. Bergwall and Gaev discussed customers and locations to which they supplied the same drums. These included their largest accounts. The purpose of these agreements was to stabilize prices and make a "reasonable margin of profit."

Stickles testified that his discussions with Gaev and Bergwall began after Mid Atlantic's owner, Daniel Milikowsky, told him to call the other two companies for any information that his salesmen might need about prices and to "be receptive to their calls" as well. After Milikowsky told Stickles that "the channels [of communication] had been opened," Stickles called Gaev and Bergwall on a regular basis to ascertain the prices they quoted to mutual customers. After receiving a competitor's price for a particular drum, Mid Atlantic offered its drum at the same price or a slightly higher price (to avoid buyer suspicion). Stickles passed on similar information to Gaev. When Stickles was unavailable, Mid Atlantic's President, Bill McEntee, exchanged information with the others.

Every time there was a general announcement of a price increase, Bergwall and Stickles talked to Gaev and agreed on the amount and timing of increases for specific customers. When one called another for a price, it was understood that the caller could meet, but not undercut, the other's price. Thus, they understood that they would compete for the customers only on the basis of service and quality, not on the basis of price. Price levels "improved" in 1987 after these agreements were in place, and by mid-1988, Van Leer internal documents reported a "stable market with higher prices."

Bergwall estimated he made hundreds of calls to Gaev and Stickles to discuss their prices, primarily at the time of price increase announcements. He estimated he talked to Gaev and Stickles about 10 times a week normally and 20–30 times a week at the time the semi-annual price increases were announced. He testified Gaev was concerned that frequent calls between competitors might appear suspicious and suggested the conspirators use aliases when calling each other. In response, the others adopted aliases when calling Gaev. In addition to conferring by telephone, Bergwall and Stickles testified they occasionally met separately with Gaev to discuss important accounts, usually at the time of price increases. Mid Atlantic records corroborate that Gaev, Bergwall, Stickles and McEntee exchanged information not only on current prices but on future prices as well. Although Gaev did not testify at his trial, his attorney, in his opening statement, acknowledged there were phone calls and meetings during the four year period; but he claimed the parties only exchanged historical price information and verified current prices and did not set future prices.

At trial, the court allowed the government to introduce evidence of its plea agreements with Bergwall, Stickles and McEntee. When Bergwall's plea agreement was introduced, over counsel's objections, the trial judge gave the following limiting instruction: [2]

> [Y]ou have just heard evidence that this witness has pled guilty to a charge of conspiring to fix prices with the defendant now on trial in this case.
>
> I caution you that although you may consider this evidence in assessing the credibility and testimony of this witness, giving it such weight as you feel it deserves, you may not consider this evidence against the defendant on trial, nor may any inference be drawn against him by reason of this witness' plea.

In his final charge to the jury, the judge reiterated and elaborated on that instruction:

> I instruct you, as I previously instructed you after the conclusion of each of their

---

2. The trial judge gave the same instruction when McEntee's plea agreement was introduced and gave a modified version for the plea agreement of Stickles, who was testifying under a grant of immunity.

testimony or direct examination, that you are instructed that you are to draw no conclusions or inferences of any kind about the guilt of the defendant on trial from the facts that a prosecution witness pled guilty to similar charges. That witness' decision to plead guilty was a personal decision about his own guilt. It may not be used by you in any way as evidence against or unfavorable to the defendant on trial here.

The trial judge went on to give extensive and detailed instructions on how the jury should consider the testimony of accomplices and admitted felons who had entered into plea agreements with the government.

### III.

The trial court's decision to admit plea agreements of co-conspirators is an evidentiary ruling which we review for abuse of discretion. *Government of the Virgin Islands v. Pinney,* 967 F.2d 912, 914 (3d Cir. 1992); *United States v. Leo,* 941 F.2d 181, 188 (3d Cir.1991).

It is well established that the plea agreements of co-conspirators cannot be used as evidence of a defendant's guilt. As we stated in *United States v. Gambino,* 926 F.2d 1355 (3d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 415, 116 L.Ed.2d 436 (1991):

There are strong considerations against using a co-conspirator's guilt as substantive evidence of another defendant's guilt. "The foundation of [this] policy is the right of every defendant to stand or fall with the proof of the charge made against him, not against somebody else.... The defendant ha[s] a right to have his guilt or innocence determined by the evidence presented against him, not by what has happened with regard to a criminal prosecution against someone else." *Bisaccia v. Attorney General of New Jersey,* 623 F.2d 307, 312 (3d Cir.) (quoting *United States v. Toner,* 173 F.2d 140, 142 (3d Cir.1949)), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980). In *Bisaccia,* a *habeas corpus* proceeding, we held that a prosecutor's use of a co-conspirator's guilty plea to establish another defendant's guilt was error, and remanded for a determination of whether the error was harmless.

926 F.2d at 1363 (alteration in original); *see also United States v. Werme,* 939 F.2d 108, 113 (3d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1165, 117 L.Ed.2d 412 (1992); *United States v. Gullo,* 502 F.2d 759, 761 (3d Cir.1974).

But "[t]his specter is not implicated when a guilty plea is introduced not to establish a co-conspirator's guilt, but for some valid purpose." *Gambino,* 926 F.2d at 1363. In *Gambino,* we gave examples of guilty pleas that had been introduced for valid purposes. *See, e.g., United States v. Casto,* 889 F.2d 562, 567 (5th Cir.1989), *cert. denied,* 493 U.S. 1092, 110 S.Ct. 1164, 107 L.Ed.2d 1067 (1990); *United States v. Dworken,* 855 F.2d 12 (1st Cir.1988); *United States v. Louis,* 814 F.2d 852 (2d Cir.1987). In *United States v. Inadi,* 790 F.2d 383 (3d Cir.), *rev'd on other grounds,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), we allowed the admission of a co-conspirator's guilty plea "in order to rebut defense counsel's persistent attempts on cross-examination to raise an inference that the co-conspirators had not been prosecuted, and that Inadi was being singled out for prosecution." *Id.* at 384, n. 2. We also allowed the government to use a co-conspirator's guilty plea to dampen attacks on credibility and foreclose any suggestion it was concealing evidence. *Gambino,* 926 F.2d at 1364. It may also be proper to introduce a witness's guilty plea to explain his firsthand knowledge of the defendant's misdeeds. *United States v. Halbert,* 640 F.2d 1000, 1005 (9th Cir.1981). "The most frequent purpose for introducing such evidence is to bring to the jury's attention facts bearing upon a witness's credibility." *Werme,* 939 F.2d at 114 (citing *Gambino,* 926 F.2d at 1363).

Underlying these valid uses of the plea agreement of a co-conspirator is a general principle, which may be stated as follows: If a co-conspirator who appears as a witness has pleaded guilty, the trier of fact should know about the plea agreement in order properly to evaluate the witness's testimony, unless that would unduly prejudice the defendant. *See* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 410[07] (1993) ("Where the co-conspirator

... testifies to his part in the transaction, it is not error to inform the jury of the plea so long as a proper cautionary instruction is given and there are no aggravating circumstances which necessarily implicate the defendant[ ] in the pleader's admission of guilt.") (footnotes omitted). When a co-conspirator testifies he took part in the crime with which the defendant is charged, his credibility will automatically be implicated. Questions will arise in the minds of the jurors whether the co-conspirator is being prosecuted, why he is testifying, and what he may be getting in return. If jurors know the terms of the plea agreement, these questions will be set to rest and they will be able to evaluate the declarant's motives and credibility. *See, e.g., United States v. Portac, Inc.,* 869 F.2d 1288, 1296 (9th Cir.1989) (*cert. denied sub nom. Wolf v. U.S.,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990)) ("The government was entitled ... to disclose the terms of the plea agreements of ... two companies in order for the jury to assess the credibility of their two officers ... who testified against [the defendant]."); *United States v. Dunn,* 841 F.2d 1026, 1030 (10th Cir.1988) ("If a [co-conspirator] testifies, the government or defense may question the witness about the plea in order for the jury to assess the credibility of the witness."); *United States v. Ben M. Hogan Co.,* 769 F.2d 1293, 1303 (8th Cir.1985) (*vacated on other grounds,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986)) (" 'Evidence [elicited by the government on direct examination that co-defendant witness] entered a plea of guilty to the same offense is not error unless it is elicited as substantive proof of the defendant's guilt.' ") (quoting *United States v. Wiesle,* 542 F.2d 61, 62 (8th Cir.1976)); *United States v. Mealy,* 851 F.2d 890, 899 (7th Cir.1988) ("The well-established rule in this circuit is that, on direct examination, the prosecutor may elicit testimony regarding the witness's plea agreement and actually

introduce the plea agreement into evidence."); *see also United States v. Casto,* 889 F.2d 562, 567 (5th Cir.1989) (prosecutor can introduce plea agreement of co-defendant witness for purpose other than to establish defendant's guilt);[3] *United States v. Louis,* 814 F.2d 852, 856 (2d Cir.1987) ("[I]t is acceptable for the government to elicit, for proper purposes and in a proper manner, an accomplice witness' testimony regarding his conviction."); *United States v. Dworken,* 855 F.2d 12, 30 (1st Cir.1988) (where cautionary instructions limited the jury's use of the guilty plea to permissible purposes, it was not error for government to reveal that co-conspirator had pled guilty); *United States v. Countryman,* 758 F.2d 574, 577 (11th Cir. 1985) (government could use guilty plea of co-conspirator witness to blunt impact of expected attacks on witness's credibility); *United States v. Halbert,* 640 F.2d 1000, 1004 (9th Cir.1981) (government may offer guilty plea of co-defendant witness for jury to consider in evaluating witness's credibility); *United States v. Warner,* 955 F.2d 441, 455 (6th Cir.), *cert. denied sub nom. Redd v. United States,* —— U.S. ——, 112 S.Ct. 3050, 120 L.Ed.2d 917 (1992) (guilty plea of co-defendant witness properly admitted to help jury assess her credibility); *United States v. Whitehead,* 618 F.2d 523, 529–30 (4th Cir. 1980), *rev'd on other grounds,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (prosecution's limited introduction of guilty pleas of co-defendant witnesses was proper); *United States v. Tyler,* 878 F.2d 753, 761 (3d Cir.), *cert. denied,* 493 U.S. 899, 110 S.Ct. 254, 107 L.Ed.2d 203 (1989) (jury instructions can cure possible error caused by introduction of witness's guilty plea); *United States v. Newman,* 490 F.2d 139, 143 (3d Cir.1974) (same).

■ While plea agreements have often been admitted in response to actual or anticipated attacks on a witness's credibility, an attack is not always necessary to justify their

---

3. *Casto* also lists several factors that courts consider in evaluating the impact of a witness's guilty plea, including

> the presence or absence of a limiting instruction, whether there was a proper purpose in introducing the fact of the guilty plea, whether the plea was improperly emphasized or used

> as a substantive evidence of guilt, and whether the introduction of the plea was invited by defense counsel.

*Casto,* 889 F.2d at 567 (quoting *United States v. Black,* 685 F.2d 132, 135 (5th Cir.), *cert. denied,* 459 U.S. 1021, 103 S.Ct. 387, 74 L.Ed.2d 518 (1982)). In this case, the plea was not improperly emphasized or used by the prosecutor.

introduction. In *Gambino,* the defendants began their attack on the credibility of the government's witnesses in their opening statements to the jury, but we noted that "even in the absence of this attack, the elicited testimony was proper here." *Gambino,* 926 F.2d at 1363.

 The trial judge must balance the probative value and prejudicial effects of evidence before deciding whether to admit it. Although the case law shows the balancing is often implicit rather than explicit, the standard remains that of Federal Rule of Evidence Procedure 403.[4] Generally, evidence of a co-conspirator's guilty plea is prejudicial to the defendant on trial absent limiting jury instructions against using the plea as substantive evidence of defendant's guilt. *Werme,* 939 F.2d at 114. As we have stated, "In several cases where evidence of a co-conspirator's guilty plea was entered, we have held that proper limiting instructions from the court cured the possible prejudice to the defendant." *United States v. Thomas,* 998 F.2d 1202, 1206 (3d Cir.1993). There also may be cases where the inference of guilt from the co-conspirator's plea agreement is sufficiently strong that even limiting instructions will not effectively contain it. In *Thomas,* we reviewed the district court's balancing of the probative value and the prejudicial effects of admitting co-conspirators' guilty pleas and held that the reasons for admitting them were "inadequate to support the risk of jury prejudice under the facts of this case."[5] *Id.* at 1205.

## IV.

 On appeal, Gaev contends that the co-conspirators' plea agreements were improp-

erly introduced in evidence and that, as a result, he is entitled to a new trial. In response to defense counsel's request to the trial judge to bar evidence of the plea agreements, the government set forth proper purposes for their introduction—that the jury would wonder why Gaev had been singled out for prosecution and whether the witnesses had been given a "sweetheart" deal in return for their cooperation. The government argued that the jury could not properly assess the credibility of the witnesses without knowledge of the plea agreements.

Over defense counsel's objections, the district court admitted the plea agreements, and sought to prevent any misunderstanding or misuse of the pleas on the part of the jury by giving detailed instructions. Although Gaev proposed alternative jury instructions which the court did not accept, he maintains that no instructions could have cured the defect of admitting the plea agreements in evidence.

Gaev contends that because he offered not to attack the witnesses' credibility on the basis of their plea agreements, as defense counsel had done in *Inadi* or *Gambino* (although he did not forswear attacks on other bases), the plea agreements should not have been admitted. Gaev also argues that our recent opinion in *United States v. Thomas,* decided shortly after his conviction, supports his position. But there are specific issues of credibility here not present in *Thomas.*[6] Gaev's attorney challenged critical aspects of Gaev's participation in the activities that formed the basis for the price-fixing charge—discussion and agreement on future prices, and in doing so, he challenged the witnesses' credibility. The credibility of Bergwall, Stickles and McEntee was relevant

---

**4.** Fed.R.Evid. 403 provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**5.** In one case, the evidence of guilt was so strong that admission of a co-conspirator's guilty plea was allowed to stand under a plain error standard even without limiting instructions from the court. *Government of the Virgin Islands v. Mujahid,* 990 F.2d 111 (3d Cir.1993).

**6.** In *Thomas,* we held "there was no direct evidence of Thomas's criminal intent and most of the circumstantial evidence of his intent was credibly contested by Thomas." *Thomas,* 998 F.2d at 1207. By contrast, Gaev's co-conspirators gave direct evidence of his participation in discussions to set future prices. In addition, in *Thomas* we said, "We are not left with the requisite 'sure conviction that the error did not prejudice the defendant,' and do not conclude that the admission of ... [the] guilty pleas was harmless error." *Id.* (citation omitted). In this case, we find neither error nor prejudice.

to establishing the underlying facts that formed the basis of Gaev's conviction. Gaev's attorney denied Gaev had agreed to fix prices with his competitors and, in cross-examining Bergwall, suggested that Bergwall's testimony had been influenced by government coaching. The district court admitted the co-conspirators' guilty pleas for proper purposes: to assist the jury in assessing the credibility of the witnesses and to make clear that Gaev was not being singled out for prosecution.

We have long recognized the hazards of admitting evidence of a co-conspirator's guilty plea to a conspiracy charge. *Thomas*, 998 F.2d at 1206; *Gambino*, 926 F.2d at 1367; *Bisaccia*, 623 F.2d at 312–13; *United States v. Toner*, 173 F.2d 140, 142 (3d Cir. 1949). Conspiracy by definition requires the participation of more than one party, and the jury may take a guilty plea by a co-conspirator as evidence of the defendant's guilt, an impermissible inference. Yet the testimony of a co-conspirator often cannot be properly evaluated without knowledge of the plea agreement. The trial court must weigh the probative value and the prejudicial effects of the plea agreement before deciding whether to admit it with limiting instructions.[7]

█ In this case, defense counsel called the balancing test to the attention of the district court and the court decided to admit the evidence with proper limiting instructions. The pleas were introduced for proper purposes. The decision whether to admit or exclude evidence is committed to the sound discretion of the district court. *In re Merritt Logan, Inc.*, 901 F.2d 349, 359 (3d Cir.1990); *Pinney*, 967 F.2d at 914; *Leo*, 941 F.2d at 188. We find no abuse of discretion here.[8]

## CONCLUSION

For reasons stated, we will affirm the judgment of the district court.

## SUR PETITION FOR REHEARING

May 26, 1994.

Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and LEWIS, Circuit Judges.

The petition for rehearing filed by appellant in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular service not having voted for rehearing, the petition for rehearing by the panel and the court in banc, is denied.

---

7. For a description of suggested proper procedures, see *United States v. Werme*, 939 F.2d at 114, n. 4.

8. In addition, Gaev raised the following points of error:
 (1) That the admission of testimony of a dissimilar and unrelated price fixing conspiracy that did not involve the defendant created unfair prejudice;
 (2) That the defendant's Sixth Amendment rights were violated because the court improperly admitted hearsay statements of the unindicted co-conspirator, Milikowsky;
 (3) That the prosecution's summation improperly commented on the defendant's failure to take the stand;
 (4) That the court's failure to grant the defendant's motion for a bill of particulars, and the lack of information as to the identity of the victims and the alleged events of the conspiracy severely prejudiced the defense; and
 (5) That the court erred in enhancing the sentencing guideline level for the defendant.
 After careful consideration of these claims, we conclude they have no merit.